## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN NEFF, derivatively and on behalf of IMMUNOMEDICS, INC., | |
| Plaintiff, | C.A. No._____ |
| v. | |
| DAVID M. GOLDENBERG, CYNTHIA L. SULLIVAN, ARTHUR S. KIRSCH, BRIAN A. MARKISON, MARY E. PAETZOLD, DON C. STARK, and PETER P. PFREUNDSCHUH, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| IMMUNOMEDICS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff John Neff ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Immunomedics, Inc. ("Immunomedics" or the "Company"), files this Verified Amended Shareholder Derivative Complaint against defendants David M. Goldenberg, Cynthia L. Sullivan, Arthur S. Kirsch, Brian A. Markison, Mary E. Paetzold, Don C. Stark, and Peter P. Pfreundschuh (collectively, the "Individual Defendants") for breaches of their fiduciary duties as former directors and/or officers of Immunomedics, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").   As and for his complaint against

the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Immunomedics, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy the Individual Defendants' breaches of fiduciary duties and other violations of the law that occurred from May 2, 2016 to the present (the "Relevant Period").

2.      Immunomedics is a clinical-stage biopharmaceutical company that focuses on the development of monoclonal antibody-based products for the targeted treatment of cancer, autoimmune, and other diseases.  The Company's core operations center around building, developing, manufacturing and commercializing a differential portfolio of biologic therapies that includes humanized antibodies and antibody-drug conjugates ("ADCs"), which are products designed to deliver a specific payload of a chemotherapeutic directly to a tumor while reducing overall toxic effects usually found with conventional administration of these chemotherapy agents. The Company's most advanced ADCs are sacituzumab govitecan ("IMMU-132") and labetuzumab govitecan ("IMMU-130").  IMMU-130 is in Phase 2 trials for metastatic colorectal

cancer.   IMMU-132 is in Phase 3 confirmatory study and has previously been granted Breakthrough Therapy Designation ("BTD") from the United States Food and Drug Administration ("FDA") for treating patients with triple-negative breast cancer ("TNBC") who have failed prior therapies for metastatic disease. IMMU-132 is currently undergoing priority review by the FDA for such treatment. The FDA accepted the Company's resubmitted a Biologics License Application ("BLA") in December 2019, after Immunomedics initially submitted in May 2018, and resubmitted in November 2019, after the FDA raised chemical, manufacturing, and controls matters. In April 2020, the FDA granted accelerated approval for the Company's "Trodelvy" (IMMU-132) for the treatment of mTNBC.

3.     IMMU-132 is the Company's lead cancer therapeutic and is being developed for the treatment of patients with many diverse solid cancers, most notably metastatic TNBC ("mTNBC"), metastatic small-cell and non-small-cell lung cancers, and metastatic urothelial cancers.   IMMU-132 is the Company's most advanced product candidate developed for the treatment of mTNBC and its commercialization is Immunomedics' top priority.

4.     One of the inventors and primary patent holders of IMMU-132 was David M. Goldenberg ("Goldenberg"), the founder of Immunomedics, former Chairman of the Company's Board of Directors (the "Board"), former Chief Scientific Officer ("CSO"), and former Chief Patent Officer ("CPO"). Defendant Goldenberg's wife, Cynthia L. Sullivan ("Sullivan") formerly served as the Company's President, Chief Executive Officer ("CEO"), and as a member of the Board.

5.     Throughout May 2016, Immunomedics repeatedly represented to the investing public that the Company would present updated results from its Phase 2 clinical study for IMMU-

132's treatment of TNBC and non-small-cell lung cancers at the prestigious Clinical Science Symposia during the American Society of Clinical Oncology ("ASCO") Annual Meeting scheduled to take place on June 3-7, 2016 in Chicago, Illinois (the "ASCO Meeting"). On May 2, 2016, the Company boasted that its abstract for IMMU-132 for the treatment of TNBC was selected as part of the "Best of ASCO" program (the "Best of ASCO Program") held from June 24-25, 2016, a prestigious event that features the top abstracts from the ASCO Meeting scheduled two weeks after the ASCO Meeting, also in Chicago, Illinois

6.      In response to the anticipated new and previously undisclosed results, the price of the Company's common stock soared. However, as the Individual Defendants were well aware, but unbeknownst to the investing public at the time, Immunomedics did not intend on providing updated results at the ASCO Meeting. Instead, the Company planned to offer data that had already been disclosed and presented at an earlier conference in April 2016 held in Boston, Massachusetts.

7.      ASCO is an organization of more than 40,000 members dedicated to promoting cancer research, education, and patient care.  ASCO's annual meetings bring together oncology professionals  from around the world and provide a forum for the presentation of new oncology research.  Each year, ASCO holds an annual meeting which is the "most prestigious and closely watched cancer conference" of the year, where investors look for the latest developments and newest clinical data on experimental cancer drugs.

8.      ASCO has strict requirements for presenters at its annual meetings with regard to restricting the prior publication of information set to be announced at the meeting. ASCO's disclosure restrictions are key to creating public and industry-specific anticipation for the annual meetings. Audiences are assured that they will receive previously unreleased data and information

during the conferences. Specifically, ASCO's policies on confidentiality, embargo and release of

information provide, in relevant part:

> Prior to the abstract information being publicly released in conjunction with an ASCO Meeting, the author, coauthors, sponsor of the research, journalists, and others may not:
>
> - Make the information public, or provide it to others who may make it public (such as news media),
> - Publish or present the information or provide it to others who may publish or present it, or
> - Use the information for trading in the securities of any issuer, or provide it to others who may use it for securities trading purposes.
>
> ***For a study to be eligible for acceptance into an ASCO Meeting, information contained in the abstract, as well as additional data and information to be presented about the study at the ASCO Meeting, must not be disclosed before the findings have been publicly released in conjunction with the ASCO Meeting.*** If information from the abstract or additional study data are disclosed in advance of public release in conjunction with an ASCO Meeting, the abstract will be subject to rejection or removal unless an official Confidentiality Policy Exception applies . . . .

(Emphasis added.)

9.      Participants in ASCO meetings are required to abide by ASCO's confidentiality and embargo policies. Thus, upon submitting an abstract, ASCO meeting participants and their representatives, including the Individual Defendants, signify that their abstracts contain new and undisclosed data and that the contents and conclusions of such abstracts remain unreported until ASCO makes the information publicly available. Submitting an abstract restricted the author, co-author, research sponsor(s), journalists, and others from publicizing the information, providing it to others who would or could publicize it, or use the information for trading in securities or providing it to others who may use it for trading in securities.

10.     However, as noted above, the information submitted in Immunomedics' abstract concerning the IMMU-132 TNBC results for presentation at the ASCO Meeting and Best of ASCO did not contain new-never-before-seen data, as conference attendees and the investing public expected. On the contrary, the data submitted in Immunomedics' abstract to ASCO had already been disclosed, reported, and presented weeks before the ASCO conferences at the Protein Engineering Summit ("PEGS") in Boston from April 25-29, 2016.

11.     Upon announcements by pharmaceutical and biotech companies that research results will be presented at the ASCO Meeting, these companies' share prices routinely increase and continue to trade at elevated prices from announcement to well after the actual presentation at the ASCO Meeting.  In fact, this occurrence is so prevalent that it is known within the industry and by analysts and media as the "ASCO Effect."  The Individual Defendants knew of the ASCO Effect, and about their obligation to adhere to ASCO's strict disclosure requirements, and exploited both to their advantage, hoping to attract the financial support needed to commercialize IMMU-132 from a licensee.

12.     Thus, the Company represented to the investing public that it had new results that it was ready to unveil via abstracts at the influential ASCO Meeting and the prestigious Best of ASCO Program.  Since the abstracts for IMMU-132 were submitted in February 2016 pursuant to published deadlines set by ASCO, their inclusion in the ASCO Meeting indicated to the investing public that the Company had new results from at least that point in time.

13.     The impact on the investing public was clear, as from April 19, 2016, the date the Company announced its participation in the ASCO Meeting, to June 2, 2016, the date the truth

- 6 -

began to emerge, the price per share of Immunomedics' stock steadily increased from a closing price of $2.95, to a closing price of $5.30, an increase of approximately 80%.

14.     On June 2, 2016, ASCO discovered that Immunomedics had misrepresented that the Company's abstract for IMMU-132's treatment of TNBC contained updated and previously undisclosed results from a mid-stage study when, in fact, the IMMU-132 data previously submitted had already been released. Consequently, ASCO removed the Company's abstract titled, "Therapy of refractory/relapsed metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results," and cancelled the scheduled presentation of the abstract from the ASCO Meeting.

15.     On the day of its scheduled ASCO presentation, the Company issued a press release on June 3, 2016, admitting that the most important of its presentations at the ASCO Meeting was cancelled.

16.     As a result of this news, Immunomedics shares fell $0.78, or 14.72%, from the previous day's closing price to close at $4.52 on June 3, 2016.

17.     The Company's June 3, 2016 press release, however, also offered the contention that ASCO was wrong in its determination, and that the Company was "attempting to reverse this with ASCO, because we believe the patient population and results reported in April were different from those in the ASCO abstract submitted last February." As such, there remained hope that new information did in fact exist, and the Company would still potentially present such data at the Best of ASCO Program.

18.     On June  21, 2016, the Company filed a current report on Form 8-K with the SEC, announcing that on June 16, 2016, just prior to the Best of ASCO Program, Immunomedics' Chief

Financial Officer ("CFO") at the time, Peter P. Pfreundschuh ("Pfreundshuh") resigned, effective June 27, 2020.

19.     Despite the Company's contentions, there was no update by the time of the Best of ASCO Program on June 24-25, 2016 that the Company was scheduled to present in.  In fact, no presentation was even made.

20.     Without any prospects of new data from the Company, the price per share of Company stock fell $2.35 per share, or approximately 52%, between June 3, 2016 and June 24, 2016, from a close of $4.52 per share on June 3, 2016 to close at $2.17 on June 24, 2016. However, during the same time, while the Company's stock price remained artificially inflated following Immunomedics' June 3rd press release, but prior to the end of the Best of ASCO Program, Defendants Goldenberg and Sullivan, dumped nearly $5 million worth of their Company stock on the market for at $3.02 to over $4.09 per share.

21.     By June 27, 2016, the first day the market was open after the Best of ASCO Program, the price per share of Company stock closed at $2.00. Between June 2, 2016 and June 27, 2016, the Company's share price declined over 62%, from closing at $5.30 per share on June 2, 2016 to close at $2.00 per share on June 27, 2016.

22.     With no licensee secured, the Company was forced to seek much-needed financing from the market in October 2016. On October 5, 2016, the Company issued a press release announcing a public offering of 10 million shares of common stock and warrants to purchase up to 10 million shares of common stock, with anticipated proceeds of $30 million. The shares were priced at $3.00 each, and the warrants would be exercisable within six months at a price of $3.75.

23.     The Company's troubles were far from over. In November 2016, the Company's largest shareholder at the time, venBio Select Advisor LLC ("venBio") submitted four new candidates for election to the Board at Immunomedics' annual meeting of shareholders, scheduled for December 14, 2016 at the time. venBio publicly criticized the Company, its management, and its Board for purportedly overseeing the destruction of stockholder value at the Company, including Immunomedics' ejection from the ASCO Meeting for violating ASCO's data embargo and the blatant insider selling by the Company's CEO (Sullivan) and CSO (Goldenberg), who were married to each other and overwhelmed the Board, and its failure to secure a licensee to market and monetize IMMU-132.

24.     In response, certain of the Individual Defendants sitting on the Board at the time, engaged in a series of actions designed to entrench themselves and maintain their influence over the Company, including: postponing the annual meeting of shareholders to fall outside of the requirements of Delaware General Corporation Law, Section 211(c); altering the configuration of the Board; engaging in a hasty license deal to sell IMMU-132, the Company's only commercially viable asset, to Seattle Genetics, Inc. ("Seattle Genetics") in a transaction that was unfair to Immunomedics; amending the Company's by-laws to alter the voting requirements for director elections and provide for mandatory advancement of attorneys' fees and costs for the Company's directors and officers; initiating a lawsuit against venBio, seeking to invalidate their proxy solicitations for their director candidates, despite shareholder support for the venBio director candidates and; following the successful election of venBio's director candidates, filing an action in the Delaware Court of Chancery challenging the election results (collectively, the "Entrenchment Actions").

25.     On February 13, 2017, venBio brought a lawsuit in the Court of Chancery of the State of Delaware, styled as *venBio Select Advisor LLC v. David M. Goldenberg et al.*, C.A. No. 2017-0108-JTL (Del. Ch. Ct.) alleging that the Board, which included Defendants Goldenberg, Brian A. Markison ("Markison"), and Sullivan, had breached its fiduciary duties by (a) rescheduling the 2016 annual meeting of shareholders, (b) agreeing to the Seattle Genetics transaction, and (c) by amending the Company's by-laws to call for a plurality voting regime for the election of directors instead of majority voting and providing for mandatory advancement of attorneys' fees and costs for the Company's directors and officers (the "venBio Action").

26.     A few days thereafter, in their continued efforts to entrench themselves, on February 17, 2017, Defendants Goldenberg, Sullivan and Markison caused the Company to initiate an action in the United States District Court for the District of Delaware against venBio, seeking to invalidate the proxies solicited by venBio in furtherance of its contest for the election of directors of the Company.

27.     On March 3, 2017, despite significant pushback from the Individual Defendants, the Company's shareholders elected venBio's slate of directors to the Board. The very next day, Defendants Goldenberg, Markison, and Sullivan made their last attempt to entrench themselves, in direct opposition to the wishes of Immunomedics shareholders, by filing an action in the Court of Chancery of the State of Delaware challenging the results of the election.

28.     By May 2017, in the midst of continued legal disputes, the Company, Seattle Genetics, Goldenberg, Sullivan, Markison and venBio reached a settlement in the venBio Action, Seattle Genetics terminated the transaction to buy IMMU-132, and Defendants Goldenberg and

Sullivan were ousted from their positions at the Company, except that Goldenberg remained a director until the 2017 annual meeting of shareholders.

29.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by participating in and facilitating the Entrenchment Actions.

30.     Also, from May 2, 2016 through June 24, 2016 (the "False Statements Relevant Period"), the Individual Defendants willfully or recklessly made and/or caused Immunomedics to make materially false and misleading statements regarding the Company's business, operational, and compliance policies.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) Immunomedics had misrepresented to ASCO and the investing public that it had new Phase 2 results for IMMU-132's treatment of refractory/relapsed mTNBC that it was to unveil at the ASCO Meeting and the Best of ASCO Program, when it did not; (2) in reality, the abstract for IMMU-132 that Immunomedics submitted to ASCO for presentation at the ASCO Meeting contained substantially the same data, information, content, and/or conclusions that the Company previously presented at the PEGS conference in Boston, disclosed in conference calls and on the Company's own website, in violation of ASCO's embargo; (3) as such, the Company faced a substantial risk that it would likely be excluded from presenting at the ASCO conferences; and (4) the Company failed to maintain effective internal controls.  As a result, the Company's statements about Immunomedics' business, operations and prospects lacked a reasonable basis at all relevant times, and caused an artificial inflation of its stock price. The Company's actions subjected Immunomedics to, and ultimately resulted in, the removal of its IMMU-132 abstract and related presentation from the ASCO Meeting.

31.     While the price of the Company's stock was artificially inflated, two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of nearly $5 million.

32.     Moreover, during the Relevant Period, in breach of their fiduciary duties, the Individual Defendants failed to maintain effective internal controls.

33.     The Individual Defendants also breached their fiduciary duties by recklessly mismanaging the Company and preventing it from participation in the ASCO Meeting and the Best of ASCO Program, which were of significant importance to the prospects of IMMU-132, and thus the Company's health and future success. In light of the Individual Defendants' misconduct, which has also subjected the Company, its former CEO, its former CFO, and its former Chairman and CSO to being named as defendants in a consolidated federal securities class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), and further subjected the Company and certain of its officers and/or directors to being named in the venBio Action, the need to undertake internal investigations, losses form the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

34.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct, including by having to pay $3.4 million in attorneys' fees and expenses to venBio to partially settle the venBio Action, which has further subjected the Company to arbitration proceedings with its insurers for their refusal to cover the aforementioned fees and expenses and continued payments

made to defend the remaining claims in the venBio Action against the Company, as nominal defendant, and certain former directors of the Board.

35.    The false and misleading statements and omissions the Individual Defendants caused Immunomedics to make allowed the Company to mislead investors as to the extent of the actual risk involved in investing in Immunomedics. The Company in fact was a materially less-safe investment than Immunomedics led investors to believe.

36.    By virtue of their leadership roles and the fact that the gross mismanagement regarding IMMU-132 and the Entrenchment Actions that followed, concerned the core operations of the Company, the Individual Defendants at all relevant times knew or recklessly disregarded that the true state of Immunomedics' business, operations, and prospects was materially different from what the Company portrayed to the investing public. Indeed, the Individual Defendants signed-off on those very statements, in misleading securities filings, press releases, and earnings calls.

37.     In addition, the Individual Defendants failed to timely correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, further rendering them personally liable to the Company for breaching their fiduciary duties.

38.    Even had they not participated in the misleading statements, Immunomedics' pervasive wrongdoing in the above-described schemes could not have escaped the notice of the Individual Defendants had they been appropriately discharging their fiduciary duties to the Company. In other words, even if the Individual Defendants had not intentionally and/or recklessly engaged in such wrongful acts, they consciously chose not to implement and maintain policies and

procedures adequate and necessary to ensure such wrongful acts did not occur (i.e., adequate internal controls), in further breach of their fiduciary duties.

39.     In the Securities Class Action, District Judge Katharine S. Hayden denied defendants Immunomedics, Sullivan, Pfreundschuh and Goldenberg's motion to dismiss on June 1, 2020, finding in her concurrent opinion that, because "reasonable investors would continue to expect presentations in June 2016 that revealed new information, beyond the contents of the Boston presentation[]" that "an inference may be drawn that defendants' May 2016 statements were false or misleading." Securities Class Action Opinion at 8, *Fergus v. Immunomedics, Inc., et al.*, Docket No. 2:16-cv-03335-KSH-CLW (D. N.J. June 1, 2020) ("Securities Class Action Opinion").

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

41.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

42.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

43.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

44.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

45.     Venue is proper in this District because Immunomedics is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

46.     Plaintiff is a current shareholder of Immunomedics common stock.  Plaintiff has continuously held Immunomedics common stock since October 3, 2013.  Plaintiff is a citizen of South Carolina.

### Nominal Defendant Immunomedics

47.     Nominal Defendant Immunomedics is a Delaware corporation with principal executive offices located at 300 The American Road, Morris Plains, New Jersey.

48.     Immunomedics is a biopharmaceutical company primarily focused on the development of monoclonal antibody-based products for the targeted treatment of cancer and other serious diseases.  The Company has developed a number of advanced proprietary technologies that allows it to create humanized antibodies that can be used either alone in unlabeled form or conjugated with radioactive isotopes, chemotherapeutics, cytokines, or toxins, to create highly targeted agents.

- 15 -

49.     Immunomedics trades under the ticker "IMMU" on the Nasdaq Stock Market LLC ("NASDAQ").

**<u>Defendant Goldenberg</u>**

50.     Defendant Goldenberg is Immunomedics' founder, former CSO, CPO, and former Chairman of the Board. Defendant Goldenberg served as a Company director from 1982 until he stepped down from the Board in 2017, and served as CSO and Chief Medical Officer ("CMO") from July 2007 until his resignation in May 2017. Defendant Goldenberg was also Immunomedics' CEO from July 1982 to July 1992, February 1994 to May 1998, and July 1999 to March 2001; Chief Strategic Officer from July 2003 to June 2007; and CSO from March 2001 to June 2003. Defendant Goldenberg also served as a director and continues to be a minority shareholder of IBC Pharmaceuticals, Inc. ("IBC"),[1] a majority owned subsidiary of the Company.

51.     Defendant Goldenberg is the husband of former CEO of the Company, Sullivan. According to the Company's Schedule 14A filed with the SEC on November 2, 2016 (the "2016 Proxy Statement"), as of October 19, 2016, Defendant Goldenberg beneficially owned 7,249,858 shares of Immunomedics stock, which represented 6.8% of the Company's outstanding common stock on that date.  Given that the price per share of the Company's stock at the close of trading on October 19, 2016 was $2.12, Defendant Goldenberg's owned approximately $15.3 million worth of Immunomedics stock.

---

[1] According to the Company's Schedule 14A filed with the SEC on April 27, 2020 (the 2020 Proxy Statement), as of December 31, 2019, Immunomedics owned 73.46% of IBC.  The 2014 Proxy sets forth the following about IBC:

52.     For the fiscal year ended June 30, 2016, the Company paid Defendant Goldenberg $4,199,439 in compensation from the Company. This included $626,126 in salary, $3,420,000 in stock awards, and $153,313 in all other compensation—which was comprised of additional incentive compensation paid to him pursuant to the Company's net income or loss and/or royalty payments for patented products invented by him.

53.     Furthermore, Defendant Goldenberg, through the David M. Goldenberg Millennium Trust, owned 18.32% of the shares of IBC during the False Statements Relevant Period, which he still owned as of December 31, 2019.  As a result of his positions with IBC and Immunomedics, Defendant Goldenberg directed the development and research activities of both companies.  Thus, in large part due to Goldenberg, newly developed intellectual property was either allocated to IBC or Immunomedics, and in some cases the property was jointly owned by IBC and Immunomedics. Thus, during the False Statements Relevant Period, Defendant Goldenberg, as well as his wife, who was also employed at IBC, stood to benefit from IMMU-132's success.

54.     The Company's 2016 Proxy Statement stated the following about Defendant Goldenberg:

> **Dr. David M. Goldenberg** founded Immunomedics in July 1982, and has served continuously since that time as the Chairman of our Board of Directors. He also currently serves as our Chief Scientific Officer and Chief Patent Officer, having been our Chief Medical Officer from July 2007 to December 2014, Chief Strategic Officer from July 2003 to July 2007. Dr. Goldenberg previously served as our Chief Executive Officer from July 1982 through July 1992, from February 1994 through May 1998 and from July 1999 through March 2001. He also serves as Chairman of the Board of Directors of IBC Pharmaceuticals, Inc., a subsidiary of Immunomedics. Dr. Goldenberg is a graduate of the University of Chicago College and Division of Biological Sciences (B.S.), the University of Erlangen-Nuremberg (Germany) Faculty of Natural Sciences (Sc.D.), and the University of Heidelberg (Germany) School of Medicine (M.D.). He has written or co-authored

approximately 1,800 journal articles, book chapters and abstracts on cancer research, detection and treatment, and has researched and written extensively in the area of radioimmunodetection and radioimmunotherapy using radiolabeled antibodies. Dr. Goldenberg was President and a Trustee of the Center for Molecular Medicine and Immunology ("CMMI"), an independent non-profit research center, and its clinical unit, the Garden State Cancer Center. In 1985 and again in 1992, Dr. Goldenberg received an "Outstanding Investigator Grant" award from the National Cancer Institute for his work in radioimmunodetection, and in 1986 he received the New Jersey Pride Award in Science and Technology. Dr. Goldenberg was honored as the ninth Herz Lecturer of the Tel Aviv University Faculty of Life Sciences. In addition, he received the 1991 Mayneord 3M Award and Lectureship of the British Institute of Radiology and in 2002, the Elis Bervin Lectureship and Medal from the Swedish Medical Society and the Swedish Oncology Society for his contributions to the development of radiolabeled monoclonal antibodies used in the imaging and treatment of cancer. The International Society for Oncodevelopmental Biology and Medicine named Dr. Goldenberg the co-recipient of the 1994 Abbott Award. In 2005, he received the Paul Aebersold Award from the Society of Nuclear Medicine and was named the Inventor of the Year by the Research and Development Council of New Jersey. Maryann Liebert Inc., publisher of Genetic Engineering News, nominated Dr. Goldenberg in 2006 for the Forbes Enterprise Award for outstanding achievements in the scientific community.

55.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Goldenberg made the following sales of Company stock (and made no purchases of Company stock):

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 6, 2016 | 174,281 | $  4.09 | $ 712,809.29 |
| June 7, 2016 | 16,900 | $  3.99 | $  67,431.00 |
| June 8, 2016 | 161,829 | $  3.63 | $ 587,439.27 |
| June 10, 2016 | 103,366 | $  3.06 | $ 316,299.96 |
| June 13, 2016 | 268,624 | $  3.02 | $ 811,244.48 |

56.     Thus, before the fraud was exposed, he sold 725,000 Company shares on inside information, for which he received approximately $2.5 million.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

57.     Upon information and belief, Defendant Goldenberg is a citizen of New Jersey.

- 18 -

### Defendant Sullivan

58.     Defendant Sullivan served as Immunomedics' President and CEO from March 2001 until her resignation in May 2017.  Defendant Sullivan also served as a director of the Company from March 2001 until May 2017.   Defendant Sullivan previously served as Immunomedics' President from December 2000 to March 2001, and Executive Vice President and Chief Operating Officer from June 1999 to December 2000.  Defendant Sullivan is the wife of Defendant Goldenberg, the founder of Immunomedics, its former CSO, and former Chairman of the Board. According to the 2016 Proxy Statement, as of October 19, 2016, Defendant Sullivan beneficially owned 7,312,068 shares of Immunomedics stock, which represented 6.8% of the Company's outstanding common stock on that date.   Given that the price per share of the Company's stock at the close of trading on October 19, 2016 was $2.12, Defendant Sullivan owned approximately $15.5 million worth of Immunomedics stock.

59.     For the fiscal year ended June 30, 2016, the Company paid defendant Sullivan $1,366,294 in compensation from the Company. This included $662,980 in salary, $350,001 in stock awards, $350,000 in option awards, and $3,313 in all other compensation.

60.     Defendant Sullivan signed the false and misleading Form 10-Q filed with the SEC on May 4, 2016, discussed herein.  Defendant Sullivan also served as President of IBC during the False Statements Relevant Period, Immunomedics' majority-owned subsidiary.

61.     The Company's 2016 Proxy Statement stated the following about Defendant Sullivan:

> **Ms. Cynthia L. Sullivan** has been employed by Immunomedics since October 1985, and has served as our President and Chief Executive Officer since March 2001. She previously served as the Company's President from December 2000 to March 2001 and as Executive Vice President and Chief Operating Officer from June 1999 to December 2000. Prior to joining Immunomedics, Ms. Sullivan was

employed by Ortho Diagnostic Systems, Inc., a subsidiary of Johnson & Johnson. Ms. Sullivan's educational background includes: a B.S. from Merrimack College, North Andover, Massachusetts, followed by a year of clinical internship with the school of Medical Technology at Muhlenberg Hospital, Plainfield, New Jersey, resulting in a M.T. (ASCP) certification in 1979. Ms. Sullivan completed a M.S. degree in 1986 from Fairleigh Dickinson University, where she also received her M.B.A. in December 1991. Ms. Sullivan also serves as President of our majority owned subsidiary, IBC Pharmaceuticals, Inc. From September 2002 to July 2007, Ms. Sullivan served as a member of the Board of Directors of Digene Corp., a company that develops, manufactures and markets proprietary DNA and RNA testing systems for the screening, monitoring and diagnosis of human diseases. Effective July 30, 2007 Digene Corp was merged with Qiagen N.V. From November, 2007 to December 2009, Ms. Sullivan served as a member of the Board of Directors of Urigen Pharmaceuticals, Inc., a specialty pharmaceutical company focused on the development and commercialization of treatments for urological disorders. As of May 2009, Ms. Sullivan also serves as a member of Board of Trustees for the HealthCare Institute of New Jersey, a trade association for the research-based pharmaceutical and medical technology industry in New Jersey.

62.      During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Sullivan made the following sales of Company stock (and made no purchases of Company stock):

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 6, 2016 | 174,281 | $  4.09 | $ 712,809.29 |
| June 7, 2016 | 16,900 | $  3.99 | $  67,431.00 |
| June 8, 2016 | 161,829 | $  3.63 | $ 587,439.27 |
| June 10, 2016 | 103,366 | $  3.06 | $ 316,299.96 |
| June 13, 2016 | 268,624 | $  3.02 | $ 811,244.48 |

63.      Thus, before the fraud was exposed, she sold 725,000 Company shares on inside information, for which she received approximately $2.5 million.  Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the fraud.

64.      Upon information and belief, Defendant Sullivan is a citizen of New Jersey.

**Defendant Pfreundschuh**

- 20 -

65.    Defendant Peter P. Pfreundschuh ("Pfreundschuh") served as the Company's CFO from September 2013 until his resignation on June 16, 2016, effective June 27, 2016, at which time he was replaced by Michal R. Garone ("Garone").   Defendant Pfreundschuh previously served as CFO for Circulite Inc.  Prior to that, Defendant Pfreundschuh was the executive director for business development and licensing for AstraZeneca Pharmaceuticals L.P.

66.    For the fiscal year ended June 30, 2016, the Company paid Defendant Pfreundschuh $524,459 in compensation from the Company. This included $316,267 in salary, $25,000 in stock awards pursuant to a consulting agreement with the Company, $60,000 in option awards, and $123,192 in all other compensation, which included severance compensation in the amount of $107,000, additional compensation for accrued vacation in the amount of $13,582, 401(k) plan match contributions, and consulting payments for the year in the amount of $1,947.

67.    Defendant Pfreundschuh signed the false and misleading Form 10-Q filed with the SEC on May 4, 2016, discussed herein.  Defendant Pfreundschuh also served as Treasurer of IBC during his tenure as CFO of the Company.

68.    The Company's Schedule 14A filed with the SEC on October 21, 2015 (the "2015 Proxy Statement") stated the following about Defendant Pfreundschuh:

**Peter P. Pfreundschuh** joined Immunomedics as Vice President, Finance and Chief Financial Officer in September 2013. From November 2008 through June 2013, Mr. Pfreundschuh was the Chief Financial Officer of CircuLite Inc., a commercial medical device company with a novel solution for the treatment of late stage chronic heart failure patients. Prior to that, Mr. Pfreundschuh was the Executive Director of Business Development and Licensing for AstraZeneca Pharmaceuticals L.P., where he led finance and negotiations in support of new business development opportunities for all external deals and alliances. Before AstraZeneca, he served at Johnson and Johnson in a variety of capacities including Controller of the R&D division and Controller/Director of Marketing and Global Business Analytics, as well as Chief Financial Officer/Treasurer for 3 Dimensional Pharmaceuticals, which was acquired by Johnson and Johnson. Mr. Pfreundschuh

has also held management positions at Alimenterics, Inc., and American Standard Companies, Inc., and was a Senior Auditor at Ernst & Young, LLP. A New Jersey Certified Public Accountant, Mr. Pfreundschuh received an MBA with a concentration in finance from Rider University, a BS in accounting from Rutgers University School of Business, and has continued his education through the Executive Strategic Marketing Program in Healthcare at the Kellogg School of Management at Northwestern University.

69.     Upon information and belief, Defendant Pfreundschuh is a citizen of New Jersey.

**Defendant Kirsch**

70.     Defendant Arthur S. Kirsch ("Kirsch") served as a Company director from 2015 until his resignation on October 13, 2016.   Defendant Kirsch served on the Audit and Governance and Nominating Committees.  Defendant Kirsch has served as Senior Advisor to GCA Savvian, LLC, an investment bank, since 2005.  Defendant Kirsch was formerly the founding member and managing director of Vector Securities, LLC from 2001 to 2005.

71.     For the fiscal year ended June 30, 2016, the Company paid Defendant Kirsch $121,500 in compensation. This included $31,500 in fees earned or cash paid, $45,00 in stock awards, and $45,000 in option awards.

72.     The Company's 2015 Proxy Statement stated the following about Defendant Kirsch:

> **Arthur S. Kirsch**, has over 30 years of experience working in the equity capital markets and has extensive knowledge of the healthcare and life sciences field. Currently a Senior Advisor with the investment bank, GCA Savvian, LLC, Mr. Kirsch also serves on the Board of Directors for POZEN Inc. and PhysioSonics, Inc.

73.     Upon information and belief, Defendant Kirsch is a citizen of New York.

**Defendant Markison**

74.     Defendant Markison served as a Company director from 2004 until April 2018. Defendant Markison served as chair of the Compensation Committee and on the Governance and Nominating and Research and Development Committees.  Defendant Markison served as a healthcare industry executive at Avista Capital Partners since September 2012.  Prior to that, Defendant Markison served as president and CEO of Fougera Pharmaceuticals.  According to the 2016 Proxy Statement, as of October 19, 2016, Defendant Markison beneficially owned 228,224 shares of Immunomedics stock. Given that the price per share of the Company's stock at the close of trading on October 19, 2016 was $2.12, Defendant Markison owned approximately $483,834 worth of Immunomedics stock.

75.     For the fiscal year ended June 30, 2016, the Company paid Defendant Markison $163,500 in compensation. This included $73,500 in fees earned or cash paid, $45,00 in stock awards, and $45,000 in option awards.

76.     The Company's 2016 Proxy Statement stated the following about Defendant Markison:

> **Brian A. Markison,** our lead independent director who brings extensive research and development, manufacturing and sales experience in the pharmaceuticals and life sciences industries, is a Healthcare Industry Executive at Avista Capital Partners, a leading private equity firm. Previously, he served as President, Chief Executive Officer and a member of the Board of Directors of Fougera Pharmaceuticals Inc. and as President, Chief Executive Officer and Chairman of the Board of Directors of King Pharmaceuticals, Inc. Mr. Markison also serves as the Chairman of the Board of Directors for Lantheus Medical Imaging Inc. and Rosetta Genomics, Ltd., and as a Director for Alere Inc. and PharmAthene, Inc.

77.     Upon information and belief, Defendant Markison is a citizen of New York.

**Defendant Paetzold**

- 23 -

78.     Defendant Mary E. Paetzold ("Paetzold") served as a Company director from 2001 until January 2017.  Defendant Paetzold also chaired the Company's Audit Committee and served on the Compensation and Governance and Nominating Committees.   Defendant Paetzold previously served as CFO of SMG Indium Resources Ltd.  According to the 2016 Proxy Statement, as of October 19, 2016, Defendant Paetzold beneficially owned 205,252 shares of Immunomedics stock. Given that the price per share of the Company's stock at the close of trading on October 19, 2016 was $2.12, Defendant Paetzold owned approximately $435,134 worth of Immunomedics stock.

79.     For the fiscal year ended June 30, 2016, the Company paid Defendant Paetzold $147,500 in compensation. This included $57,500 in fees earned or cash paid, $45,00 in stock awards, and $45,000 in option awards.

80.     The Company's 2016 Proxy Statement stated the following about Defendant Paetzold:

> **Mary E. Paetzold,** has over 40 years of experience in accounting, internal controls and finance functions. Ms. Paetzold was a former partner of KPMG, LLP and is Chief Financial Officer of SMG Indium Resources Ltd.

81.     Upon information and belief, Defendant Paetzold is a citizen of North Carolina.

**Defendant Stark**

82.     Defendant Don C. Stark ("Stark") served as a Company director from 2005 until January 2017.  Defendant Stark served as a member of Audit Committee and Governance and Nominating Committees.   Defendant Stark also chaired the Research and Development Committee.  Defendant Stark also served as the CEO and president of Whistler Associates, Inc.  According to the 2016 Proxy Statement, as of October 19, 2016, Defendant Stark beneficially

owned 193,626 shares of Immunomedics stock. Given that the price per share of the Company's stock at the close of trading on October 19, 2016 was $2.12, Defendant Stark owned approximately $410,487 worth of Immunomedics stock.

83.     For the fiscal year ended June 30, 2016, the Company paid Defendant Stark $135,500 in compensation. This included $45,500 in fees earned or cash paid, $45,00 in stock awards, and $45,000 in option awards.

84.     The Company's 2016 Proxy Statement stated the following about Defendant Stark:

 *Don C. Stark,* brings extensive expertise in the fields of oncology and immunology both in marketing and sales through his experience with Bristol-Myers Squibb, Immunex, Repligen and most recently through his position as President and Chief Executive Officer of Whistler Associates, Inc., a marketing and strategic planning consulting firm focused on the field of oncology.

85.     Upon information and belief, Defendant Stark is a citizen of Vermont.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

86.     By reason of their positions as officers, directors, and/or fiduciaries of Immunomedics, and because of their ability to control the business and corporate affairs of Immunomedics, the Individual Defendants owed Immunomedics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Immunomedics in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Immunomedics and its shareholders so as to benefit all shareholders equally.

87.     Each director and officer of the Company owes to Immunomedics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

88.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Immunomedics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

89.     To discharge their duties, the officers and directors of Immunomedics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

90.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Immunomedics, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Immunomedics' Board at all relevant times.

91.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the  Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings,

internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

92.     To discharge their duties, the officers and directors of Immunomedics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Immunomedics were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, the United States, and pursuant to Immunomedics' own Codes, defined below, and other internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Immunomedics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Immunomedics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Immunomedics' operations would comply with all

- 27 -

laws and Immunomedics' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

93.     Each of the Individual Defendants further owed to Immunomedics and the shareholders the duty of loyalty requiring that each favor Immunomedics' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

94.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Immunomedics and were at all times acting within the course and scope of such agency.

- 28 -

95.     Because of their advisory, executive, managerial, and directorial positions with Immunomedics, each of the Individual Defendants had access to adverse, non-public information about the Company.

96.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Immunomedics.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

97.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

98.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

99.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Immunomedics was a direct, necessary, and substantial

participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

100.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

101.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Immunomedics, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS & CODE OF BUSINESS CONDUCT

102.    Pursuant to the Company's Code of Ethics for CEO and Senior Financial Officers (the "Code of Ethics"), the conduct of all of the Company's senior financial and accounting officers, including the CEO, CFO, principal accounting officer, and persons performing similar functions, are governed by the Code of Ethics.

103.    The Code of Ethics states, in pertinent part:

The Chief Executive Officer ("CEO") and all senior financial and accounting officers of Immunomedics, Inc. (the "Company") have important and vital roles in the corporate governance of the Company.  This Code of Ethics (the "Code") has been adopted by the Board of Directors of the company to establish standards of conduct designed to promote (1) honest and ethical conduct by such senior officers, (2) full, fair, accurate, timely and understandable disclosure in the company periodic reports filed with the Securities and Exchange Commission (the "SEC") and (3) compliance by such senior officers with applicable governmental laws, rules and regulations.

- 30 -

The provisions of this Code shall apply to the company's CEO, Chief Financial Officer ("CFO"), Director of Finance, Controller, principal accounting officer, and persons performing similar functions (each individually, a "Senior Officer" and collectively, the "Senior Officers"). Each Senior Officer must conduct himself or herself in accordance with this code and seek to avoid even the appearance of improper behavior. Senior Officers should also refer to the company's code of Business Conduct, which supplements and is in addition to this Code. . . .

The following standards shall apply to the Senior Officers under this Code . . . .

104.    The Code of Ethics states, as to "Honest and Ethical Conduct," that:

**I.    Honest and Ethical Conduct.**

Each Senior Officer shall:

1.  always conduct himself or herself in an honest and ethical manner;

2.  act with the highest standards of personal and professional integrity;

3.  respect the confidentiality of information acquired during the course of employment with the Company and not use any such confidential information for personal gain;

4.  achieve responsible use of and control over all assets and resources employed or entrusted to him or her;

5.  proactively promote and advocate ethical behavior in the Company's work environment; and

6.  ensure that he or she discloses, to the Board of Directors, or a designated committee of the Board, and material facts or information that come into the Senior Officer's possession concerning any "related party" transaction with the company.  A "related party" is any director, executive officer, nominee for election as director or securityholder who is known to hold more than five percent of any class of the Company's voting securities, and any member of the immediate family (as such term in defined under the NASDAQ corporate governance rules) of any of the foregoing persons. A related party also includes any entity that is affiliated with a director, executive officer, a nominee for election as a director or significant securityholder.

All actual or apparent conflicts of interest between personal and professional relationships must be handled honestly, ethically and in accordance with the policies specified in this Code.

- 31 -

105.     The Code of Ethics states, as to "Rules to Promote Full, Fair, Accurate, Timely and

Understandable Disclosure," that:

**II.     Rules to Promote Full, Fair, Accurate, Timely and Understandable Disclosure.**

To the extent consistent with each Senior Officer's duties and responsibilities, each Senior Officer must take the following steps to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the company files with the SEC and in other public communications made by the Company:

1.   Carefully review a draft of each periodic SEC report and related documents for accuracy and completeness before each such report is filed with the SEC, with particular focus on disclosures issues within his or her area of responsibility.

2.   Carefully review a draft of each financial press release or other public communications by the Company before each such communication is released to the public.

3.   Upon request of the Company's Audit committee, meet with its members and others involved in the financial reporting and audit processes to discuss the draft report referred to in item (1) above.

4.   Bring to the attention of the Audit Committee matters that such Senior Officer believes could compromise the integrity of the Company's financial reports, evidence disagreements on accounting matters and or constitute a possible violation of this Code.

5.   Actively support the Company's CFO (by cooperating fully with periodic SEC report reviews, proactively identifying potential areas of weaknesses and providing corrective policy recommendations) to help establish and maintain disclosure controls and procedures that ensure that material information is included in each periodic SEC report.

6.   Consult with the Audit Committee on a regular basis to identify any shortcomings or concerns with respect to the Company's internal financial reporting or disclosure controls.

7.   Confirm that neither the Company's internal auditor function, nor its outside accountants, are aware of any material misstatements or omissions in any draft periodic SEC report referred to in item (1) above, or have any concerns about the "Management's Discussion and Analysis" section of such periodic report.

8. Always act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing independent judgment to be subordinated.

106.   The Code of Ethics states, as to "Compliance with Applicable Governmental Laws, Rules and Regulations," that:

### III.   Compliance with Applicable Governmental Laws, Rules and Regulations.

Compliance with applicable governmental laws, rules and regulations, both in letter and in spirit, is one of the foundations on which the Company's ethical policies are built, and accordingly, each Senior Officer must strive to:

1. Understand and take responsibility to comply with the governmental rules and regulations of the countries, states and communities in which the Company operates, with particular focus on understanding the governmental rules and regulations applicable to disclosures in the Company's periodic SEC reports.

2. If a federal, state, local, international or foreign law conflicts with a policy in this Code, a Senior Officer must comply with the law; however, if a local custom or policy in the territory in which a Senior Officer works conflicts with this Code, then the Senior Officer must comply with this code. Any questions regarding such conflicts or the interpretation of policies contained in this Code should be brought to the attention of the Audit committee in order to determine the most appropriate course of action.

107.   The Company's Code of Business Conduct (together with the Code of Ethics, the "Codes"), requires all employees of the Company to act in accord with its policies and to "seek to avoid even the appearance of improper behavior."

108.   The Code of Business Conduct states, in pertinent part:

It is the policy of Immunomedics, Inc. ("Immunomedics" or "the Company") that each employee observes the highest standards of ethical behavior in the performance of his or her duties for the Company.  This Code of Business Conduct (the "Code") covers a wide range of business practices and procedures.  It does not cover every issue that may arise, but it sets out basic principles to guide all employees of the Company.  All employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior.

If a federal, state, local or foreign law conflicts with a policy in this Code, an employee must comply with the law; however, if a local custom or policy in the territory in which an employee works conflicts with this Code, an employee must comply with the Code.  Situations may arise that are not expressly covered by this Code or where the proper course of action is unclear.  If such a situation arises, or if you have questions regarding the interpretation of policies contained in this Code, you should consult with the President and CEO, the Senior Vice President of Finance and CFO, or Human Resources (the "Compliance Officers"), or with your supervisor.

The Company also has adopted other policies that provide guidelines for the conduct of employees in specific areas of the Company's business.  The following stand-alone policies are located in Immunomedics' Employee Handbook, but should be considered a part of this Code:

- Conflict of Interest
- Confidentiality and Assignment Agreement

* * *

- Dealing with Allegations of Scientific Misconduct

* * *

- Accurate Recordkeeping & Corporate Records Retention Policy
- Insider Trading & Foreign Corrupt Practices
- External Corporate Communications Policy and Procedures
- Fair Disclosures Rules Policy

109.    The Code of Business Conduct states, as to "Applicability," that:

**APPLICABILITY**

This Code is applicable to all Immunomedics employees.  No employee of the Company shall effect or participate in any activity, arrangement or transaction which will, directly or indirectly, result in any action prohibited by this Code.  The Code should also be provided to and followed by the Company's agents and representatives, including consultants.

110.    The Code of Business Conduct states, as to "Proper Use of Company Property,"

that:

**PROPER USE OF COMPANY PROPERTY**

- 34 -

Proper protection and use of Company assets, including proprietary information, is a fundamental responsibility of each employee.  The use of the Company's funds, services or assets for an illegal or improper purpose is strictly prohibited.

The removal from Immunomedics' facilities of any Company property is prohibited unless necessary to perform the requirements of the employee's position and is properly authorized. This applies to furnishings, equipment and supplies, as well as property created or obtained by the Company for its exclusive use, such as client lists, files, personnel information, reference materials and reports, computer software, data processing programs and data bases, agreements, forecasts and regulatory filings.

Immunomedics' products are its property too. Contributions made by any employee to their development and implementation are the Company's property and remain the Company's property even if the individual resigns or his or her employment is otherwise terminated.

111.    The Code of Business Conduct states, as to "Corporate Opportunities," that:

**CORPORATE OPPORTUNITIES**

Employees, officers and directors are prohibited from taking for themselves personally opportunities that are discovered through the use of the Company's property or information without the consent of the Board of Directors or a committee of the Board authorized to approve such action.  No employee, officer or director may use the Company's property or information, or such person's position with the Company for improper personal gain, or may compete with the Company, directly or indirectly.  Employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

112.    The Code of Business Conduct states, as to "Compliance with Laws Generally,"

that:

**COMPLIANCE WITH LAWS GENERALLY**

Obeying the law, both in letter and in spirit, is the foundation on which Immunomedics' ethical standards are built.  All employees must respect and obey the laws of the countries, states and local areas in which we operate.  Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors or the Compliance Officers.

113.    In violation of the Codes, each of the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements, of the Individual Defendants' schemes to issue materially false and misleading statements to the public and to engage in the Entrenchment Actions, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.   In violation of the Codes, the Individual Defendants consciously disregarded their duties to:   (1) comply with the applicable laws and regulations; (2) conduct themselves ethically and properly; (3) avoid improperly disclosing confidential information to non-privy parties; (4) avoid any outside financial interest that might influence their decisions or actions on matters involving the Company or its businesses or property; (5) protect corporate assets; (6) engage in fair dealing; (7) avoid using corporate opportunities for personal gain; (8) avoid conflicts of interest; (9) avoid insider trading; (10) report violations of the Codes; (11) appropriately maintain the Company's books, records, accounts, and financial statements; and (12) make accurate filings with the SEC.

## SUBSTANTIVE ALLEGATIONS

### Background of Immunomedics

114.    Immunomedics is a clinical-stage biopharmaceutical company, founded by Defendant Goldenberg in 1982, that focuses on the development of monoclonal antibody-based products for the targeted treatment of cancer, autoimmune, and other diseases.   During the False Statements Relevant Period, the Company had a pipeline of eight clinical-stage product candidates at various developmental stages, including seven late-stage antibody-based therapies, one[2] of

---

[2] Epratuzumab, for the treatment of pediatric acute lymphoblastic leukemia.

which was in Phase 3 clinical trials, four[3] of which were in Phase 2 clinical trials, and two[4] of which were in Phase 1 clinical trials.

115.     The Company's pipeline contains humanized ADCs, which are products designed to deliver a specific payload of a chemotherapeutic directly to a tumor while reducing overall toxic effects usually found with conventional administration of these chemotherapy agents.   The Company's most advanced ADCs are sacituzumab govitecan (IMMU-132) and labetuzumab govitecan ("IMMU-130").   IMMU-132 is in Phase 2 trials for a number of solid tumors and IMMU-130 is in Phase 2 trials for metastatic colorectal cancer. In April 2020, the FDA granted accelerated approval for the Company's "Trodelvy" (IMMU-132) for the treatment of mTNBC for patients who have received at least two prior therapies for metastic disease. The "ASCENT" trial for mTNBC of IMMU-132 is in Phase 3 confirmatory study.

116.     IMMU-132 and IMMU-130 facilitate targeted delivery of SN-38, the active metabolite of irinotecan (an effective yet toxic chemotherapeutic) more directly to tumor cells. The Company's novel and proprietary ADC linking system keeps SN-38 conjugated to the antibody in an inactive form while IMMU-132 and IMMU-130 are circulating in the blood stream, reducing toxicity to normal tissues.

117.     IMMU-132, as the Company notes, is Immunomedics' lead cancer therapeutic, and is being developed for the treatment of patients with many diverse solid cancers, most notably mTNBC, metastatic small-cell and non-small-cell lung cancers, and metastatic urothelial cancers. The most advanced indication of IMMU-132 in development is for TNBC, which has been granted

---

[3] Sacituzumab govitecan, for the treatment of metastatic TNBC; sacituzumab govitecan for the treatment of metastatic solid cancers; labetuzumab govitecan, for the treatment of metastatic colorectal cancer; and veltuzumab, for cancer and autoimmune diseases.
[4] Milatuzumab, for autoimmune diseases; and IMMU-114 for hematologic malignancies.

Breakthrough Therapy Designation (BTD) from the FDA for the treatment of patients with mTNBC who have failed at least two prior therapies.

118.    Since 1982, when Immunomedics was founded, the Company has operated at a financial loss and in all likelihood its operating expenses will continue to exceed its revenues for the foreseeable future.  The Company had accumulated a deficit of approximately $368.5 million by June 30, 2016 and $1.3 billion as of December 31, 2019. Since its inception, the Company's "principal sources of funds have been the private and public sale of equity and debt securities, and revenues from licensing agreements . . . and other forms of collaborations." Its only significant sources of revenue in recent years resulted from a research collaboration agreement with Bayer and a licensing agreement with UCB S.A., a Belgian biotechnology company.  On February 25, 2016, however, UCB S.A. informed the Company that their licensing agreement would be terminated effective March 26, 2016.

119.    In February 2017, the Company entered into a global license agreement for the sale of IMMU-132 with Seattle Genetics (discussed below). The agreement was terminated in May 2017, following intense legal battles related to the venBio Action. More recently, in April 2019, the Company announced that it had entered into an exclusive license agreement to develop, register, and commercialize IMMU-132 in Greater China, South Korea, and certain Southeast Asian countries with Everest Medicines II Limited ("Everest"), a C-Bridge Capital-backed biopharmaceutical company. In consideration for the license agreement, Everest made a one-time payment of $65 million, and the agreement between the companies includes additional payments in a total amount of up to $180 million. The Company has also engaged in a promotion agreement with Janssen Biotech Inc.

120.     The Company's only product sales have been the sales of its diagnostic imaging product, which were limited and the patent protection for which has expired.  Management has made the "strategic" decision to focus on Immunomedics' therapeutic pipeline, but the Company has yet to have product sales of any therapeutic product, even as recent as May 2020, although Trodelvy's recent FDA approval may result in product sales, royalties under the Company's royalty agreement connected with revenues may erode the product's profitability.  It is likely that the Company will never become profitable or generate significant revenues if it cannot develop commercially viable therapeutic products or license them to third parties.  Such failure would jeopardize the Company's ability to continue to operate.

121.     Throughout the Relevant Period IMMU-132 was, and remains the Company's most advanced ADC.

**IMMU-132's Prospects**

122.     On February 3, 2016, the Company issued a press release noting that Immunomedics "ha[d] reached agreement with the U.S. Food and Drug Administration regarding a Special Protocol Assessment (SPA) on the design of a Phase 3 trial of [IMMU-132] for the treatment of patients with metastatic triple-negative breast cancer."

123.     On February 5, 2016, the Company issued a press release that announced that the FDA had granted "breakthrough therapy designation" to Immunomedics for IMMU-132 for the treatment of TNBC and noted that the breakthrough therapy designation was created to expedite the development and review of a drug that is intended, alone or in combination with one or more other drugs, to treat a serious or life-threatening disease or condition, and where preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing

therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development.  In the press release, Defendant Sullivan stated, in relevant part:

> IMMU-132 is also in Phase 2 trials in patients with advanced, heavily-pre-treated, non-small-cell lung cancer, small-cell lung cancer, and urothelial cancers, where encouraging results have been observed. The Trop-2 receptor targeted by this antibody-drug conjugate has increased expression in a large number of solid cancers. To date, we have enrolled about 300 patients with diverse cancer types.

124.    In his annual "Chairman's Message" in 2016, Defendant Goldenberg noted the Company's focus on finding a licensing partner, and how this was "essential," stating, in relevant part:

> Our Company's mission is to be a leading, innovative biopharmaceutical company, dedicated to improving health and quality of life with novel immunotherapeutics for the treatment of cancer autoimmune and other serious diseases. I believe we, as a Company, are at the cusp of achieving this goal with sacituzumab govitecan (IMMU-132), our lead antibody-drug conjugate (ADC).
>
> * * *
>
> Given the tremendous promise of IMMU-132 to treat such a broad range of solid tumors in patients with few treatment options, I feel a strong responsibility to bring this drug candidate to as many patients, in as many indications, as quickly as possible. In our corporate lifetime, we have been focused primarily on research and development. We recognize that we do not have all the resources required to realize the full healthcare potential of IMMU-132. So it's essential, and we are focused, on finding the right partner, with the right resources, enthusiasm and steadfast devotion to bring IMMU-132 to every patient who needs it in time to make a difference in their lives.

**Background on ASCO and the ASCO Effect**

125.    ASCO is a nonprofit organization of more than 45,000 members dedicated to promoting cancer research, education, and patient care.  ASCO's annual meetings bring together oncology professionals  from around the world and provide a forum for the presentation of new

oncology research.  Each year, ASCO holds an annual meeting which is the "most prestigious and closely watched cancer conference" of the year, where investors look for the latest developments and newest clinical data on experimental cancer drugs. The ASCO annual meeting draws the best and brightest investigators and clinicians, emphasizing that it "is considered the premiere international forum for the presentation of scientific research and state-of-the-art education in clinical oncology."

126.    ASCO has strict requirements for presenters at its annual meetings with regard to restricting the prior publication of information set to be announced at the meeting, which state, in relevant part:

> Prior to the abstract information being publicly released in conjunction with an ASCO Meeting, the author, coauthors, sponsor of the research, journalists, and others may not:
>
> - Make the information public, or provide it to others who may make it public (such as news media),
> - Publish or present the information or provide it to others who may publish or present it, or
> - Use the information for trading in the securities of any issuer, or provide it to others who may use it for securities trading purposes.
>
> **_For a study to be eligible for acceptance into an ASCO Meeting, information contained in the abstract, as well as additional data and information to be presented about the study at the ASCO Meeting, must not be disclosed before the findings have been publicly released in conjunction with the ASCO Meeting._**  If information from the abstract or additional study data are disclosed in advance of public release in conjunction with an ASCO Meeting, the abstract will be subject to rejection or removal unless an official Confidentiality Policy Exception applies . . . .

(Emphasis added.)

127.    The ASCO Abstract Confidentiality Policy, which is known to investors and presenters alike, and posted on ASCO's website, am.asco.org, requires that all submitters of

abstracts "agree to the confidentiality policy, which states that all abstracts become final and confidential from the time of submission to any ASCO sponsored or ASCO co-sponsored meeting where ASCO is a lead sponsor." Prior to the annual ASCO meeting, the author or co-author of an abstract, sponsor of the research, and journalists, among others, are prohibited from making the information in the abstract public, providing it to others who may make it public, presenting or publishing the information or providing it to others who do, and providing the information to anyone who may use the information to trade securities. The Policy notes, in relevant part:

> Abstracts submitted to ASCO Meetings are considered final and confidential from the time of submission. The Confidentiality Policy covers all abstracts, including placeholder abstracts and late-breaking data submission abstracts. Compliance with the Confidentiality Policy by all parties related to the abstract is the responsibility of the First Author, and the First Author will be held accountable for any violations of ASCO's policy. ***Prior to the abstract information being publicly released in conjunction with an ASCO Meeting***, the author, coauthors, sponsor of the research, journalists, and others may not:
>
> - ***Make the information public, or provide it to others who may make it public (such as news media);***
> - ***Publish or present the information or provide it to others who may publish or present it; and***
> - ***Use the information for trading in the securities of any issuer, or provide it to others who may use it for securities trading purposes.***
>
> For a study to be eligible for acceptance into an ASCO Meeting, ***information contained in the abstract, as well as additional data and information to be presented about the study at the ASCO Meeting, must not be disclosed before the findings have been publicly released in conjunction with the ASCO Meeting. If information from the abstract or additional study data are disclosed in advance of public release in conjunction with an ASCO Meeting, the abstract may be subject to rejection or removal*** unless an official Confidentiality Policy Exception applies (see below).

(Emphasis added).

128.    Notably, upon information and belief, as of May 31, 2016, ASCO had not granted any exceptions to their confidentiality policies.

129.    As the yearly ASCO meeting is monitored closely by the biotechnology industry, several biotechnology companies working on oncology therapies experience immense surges in their stock prices when they announce that their abstracts have been accepted for presentation at the meeting, which can occur weeks or even months before the actual conference.  This is known by the industry, media, and biotech investors as the "ASCO Effect."  Investors hope to invest in a company that will present at the ASCO meeting and announce information that increases the company's value.  Such surges in stock price usually last from the time of announcement of being accepted into the ASCO meeting to weeks after the meeting is over and investors have digested the information announced.  Investors are aware that pursuant to ASCO rules, research that is presented at the meeting is to be new and embargoed until the meeting.  This embargo generates excitement in the investing community, since significant gains can be made with mitigated risk if trading is done correctly.

**The Individual Defendants Exploited the ASCO Effect**

130.    The Individual Defendants were well aware of the ASCO Effect.  In 2014 and 2015, the Company repeatedly touted IMMU-132, and made certain to announce whenever one of the Company's abstracts was chosen by ASCO for presentation at the ASCO meeting.

131.    During a May 8, 2014 earnings call, for example, Defendant Goldenberg stated, "The IMMU-132 study involving multiple cancer types, will also be updated at the 2014 Annual Meeting of ASCO on Monday, June 2 in a Poster Highlights Session . . . ."  This specific announcement increased the price per share of Company stock by approximately 4.6% to close at $3.21 on May 9, 2014.

- 43 -

132.    On May 15, 2014, the Company issued a press release announcing that it would be making presentations on five product candidates at the ASCO meeting on June 1 and 2, 2014, specifically noting two IMMU-132 presentations, "Characterization of an anti-TROP-2-SN-38 antibody-drug conjugate (IMMU-132) with potent activity against solid cancers", published in part by Defendant Goldenberg and "IMMU-132, an SN-38 antibody-drug conjugate (ADC) targeting TROP-2, as a novel platform for the therapy of diverse metastatic solid cancers: Clinical results."

133.    Following the Company's initial announcement on May 8 through June 11, 2014—just a few days following the scheduled ASCO meeting, the Company's stock rose by approximately 26%, from closing at $3.06 on May 8, 2014 to close at $3.85 on June 11, 2014.

134.    The following year, in 2015, prior to the ASCO meeting, the Individual Defendants sought to find a licensing partner.  During a May 7, 2015 earnings call, Defendants Goldenberg and Sullivan commented on, among other things, the ASCO meeting, the status of IMMU-132, future FDA plans, and the importance of bringing in a licensing partner to bring their plans to fruition.  The call included the following exchanges between analysts and Defendants Goldenberg and Sullivan:

[Ryan Martins, Jefferies LLC, Research Division]

Okay.  And is that contingent on a partnership?  Or you can do this yourself?

[Defendant Goldenberg]

Our plan is to bring a partner in. And we hope to have a partner in to do that with us. That's our plan. Our first indication, which I'm going to volunteer to discuss with you, is probably triple-negative breast cancer. But we have excellent data in the other tumors that I discussed and there's maybe more than 1 indication, and that's why it's important to have a partner on board.

* * *

- 44 -

[Matthew J. Andrews, Wells Fargo Securities, LLC, Research Division]

Okay. Great. And then I appreciate that the number of patients is small for a – when you split the dose for 8 and 10 with the non-small cell lung cancer cohort, but is there any meaningful difference in response CBR or PFS between the 2 doses at this point in time? Or are we going to get an update on that at ASCO in 3 weeks?

[Defendant Goldenberg]

I think you'll get an update at ASCO . . . .

[Matthew J. Andrews, Wells Fargo Securities, LLC, Research Division]

Okay. And just the last one. I think on the prior call, you had mentioned the 4 tumor types of interest with 132 were triple-negative non-small cell, small cell and colorectal. So is licensing of rights to the colorectal indication for 132 off the table since this was the indication you were planning to pursue for 130?

[Defendant Goldenberg]

We are only discussing licensing with 132. 130, although there is interest that's been expressed and some discussions have begun in a very early phase, our interest is to license 132 because we hope to be in the – in sometime in the middle of 2016, in the registration trial. So we have to move on that.

[Matthew J. Andrews, Wells Fargo Securities, LLC, Research Division]

Yes, but would colorectal be part of that license? Or would you keep that for yourself so that you have 130 for that indication?

[Defendant Goldenberg]

The 132 would include all indications, including colorectal and pancreas . . . . I – and we want to check this with our advisers at ASCO, is how to develop the colorectal cancer in a registration trial while we're moving very quickly with triple-negative breast and non-small cell lung. So it requires a partner with as much of a commitment as we have, great interest and deep pockets to develop so many indications over the next few years.

[Defendant Sullivan]

I'll answer just that, Matt. I think with regard to your question, it's impossible to separate out certain indications. We're talking about out-licensing the asset IMMU-132 here. That doesn't mean that IMMU-130 can't also be developed in certain

- 45 -

indications that are covered by 132. It's a different antibody, the expression occurs in some overlap and some other cancer types where the plan is to continue moving that forward as well.

There is the potential for different combinations with the 130 as there is with 132. So we're not separating out indications, we're licensing an asset.

135.    During the earnings call, Defendants Goldenberg and Sullivan showed the importance of presenting at the ASCO meeting and gaining a licensing partner for IMMU-132 to get it through Phase 3 trials.  As a result of the earnings call, the price per share of Company stock increased $0.18, or 4.7%, from the previous day's closing price to close at $3.98 on May 8, 2015.

136.    On May 14, 2015, the Company issued a press release announcing that two of its five abstracts submitted to the 2015 ASCO meeting had been accepted as oral presentations.  The press release stated, in relevant part:

Immunomedics, Inc., (Nasdaq: IMMU) today announced ***that two of its five abstracts submitted to the 2015 Annual Meeting of the American Society of Clinical Oncology (ASCO) have been accepted as oral presentations.***

The two oral presentations will be on the Company's second-generation antibody-drug conjugate (ADC) programs for solid cancer therapy. Leading that program is [IMMU-132], an anti-TROP-2 antibody conjugated with SN-38, an active drug from irinotecan. Irinotecan is approved for the treatment of patients with colorectal cancer. Results from a Phase 2 study of [IMMU-132] in patients with advanced lung cancer will be updated in one of the 2 oral presentations. In addition to this oral presentation, results with [IMMU-132] in patients with late-stage triple-negative breast and gastrointestinal cancers will be reported in a Poster Discussion and a Poster Sessions, respectively.

(Emphasis added).

137.    On this news, the price per share of Company stock increased $0.05, or about 1.2%, from the previous day's closing price of $4.07 on May 14, 2015, to close at $4.12 on May 15, 2015.

138.    The Company's common stock continued to rise following the ASCO announcement on May 7, 2015 throughout the month of June 2015, increasing approximately 30% from a close of $3.80 on May 7, 2015, to a high of $5.03 on June 8, 2015. During the month of June, with the benefit of the ASCO Effect, Defendants Goldenberg and Sullivan sold hundreds of thousands of Company shares, for the first time since March 2009. Within two months, the Company's shares were trading at prices that were more than 60% lower than the share price during June 2015. Defendants Markison, Paetzold, and Stark also sold thousands of shares in June 2015.

**The Company Agrees to Abide by ASCO Confidentiality Policy**

139.    In February 2016, Immunomedics submitted for presentation at the ASCO Meeting at least two abstracts for IMMU-132, titled "Therapy of relapsed/refractory metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), acituzumab govitecan (IMMU-132): Phase II results," and "Trop-2 as a therapeutic target for the antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132), in patients (pts) with previously treated metastatic small-cell lung cancer (mSCLC)," with both listing Defendant Goldenberg as an author.

140.    As the Company had submitted abstracts in previous years, the Individual Defendants were well aware that by submitting them, they were agreeing to abide by ASCO's strict confidentiality and embargo policies, and to not to disclose the data contained therein prior to the ASCO Meeting.

141.    Based on their knowledge of ASCO's Abstract Confidentiality Policy, the Individual Defendants were aware that if ASCO had discovered any breach of its Policy, ASCO could eliminate an already accepted abstract from the ASCO meeting presentations as punishment

for violating the Policy, especially given that as of that point in time, ASCO had not granted any exceptions to its policy.  Defendant Goldenberg was especially aware, as he previously submitted at least two abstracts for presentation at the ASCO meeting in 2014 and 2015 as a co-author.

**Defendants Goldenberg and Sullivan Especially Benefit from Company Success**

142.    Defendant Goldenberg personally stood to gain from the commercialization of IMMU-132 through royalties as the inventor and patentee of IMMU-132.  Goldenberg and the Company are parties to a license agreement where certain patent applications owned by Defendant Goldenberg were licensed to the Company at the time of its formation in exchange for a royalty in the amount of 0.5% of the first $20 million of annual net sales of all products covered by any such patents and 0.25% of annual net sales of such products in excess of $20 million.

143.    As part of Goldenberg's employment agreement, in November 1993, the ownership rights of the Company were extended and superseded, with the Company agreeing to diligently pursue all discoveries, ideas, developments, and products, into the entire medical field, which, at any time during his past or continuing employment by the Company, Defendant Goldenberg has made or conceived or makes or conceives, or the making or conception of which he materially contributed to or contributes to, all as defined in his employment agreement.

144.    Effective July 1, 2015, Defendant Goldenberg's term of employment was extended for five years until July 1, 2020, pursuant to the amended and restated employment agreement entered into by him and Immunomedics.  As part of the employment agreement, Goldenberg is eligible to receive royalty payments on royalties received by the Company, and for each fiscal year, Immunomedics is obligated to pay Goldenberg a sum equal to a percentage of annual royalties received by the Company on each of the products for which Goldenberg is an inventor,

and all products using, related to, or derived from products for which is an inventor.  Moreover, pursuant to the agreement, such payments shall continue for each patented product for the remaining life of the patent covering each patented product.  The employment agreement also provides that if the Company completes a disposition during the term of Goldenberg's employment or within three years thereafter, or any one or more of the Company's undeveloped assets for which he was an inventor, the Company will pay him a sum equal to at least twenty percent, or more as determined by the Board, of the consideration the Company receives from each disposition, upon receipt. Even despite Defendant Goldenberg's resignation in May 2017, pursuant to his settlement agreement with the Company in connection with the venBio Action, the Company's obligations for royalties and other payments to Goldenberg shall be in accordance with the employment agreement described above.

145.    The U.S Patent and Trademark database reveals that on a substantial amount of issued IMMU-132 patents, Defendant Goldenberg is listed as an inventor and patentee.[5]  Also pursuant to his employment agreement with Immunomedics during the False Statements Relevant Period, Defendant Goldberger, as well as Sullivan, stood to gain from any disposition, including via licensing or otherwise to third parties of the Company's rights, interests, or titles to any of its products—such as IMMU-132.

146.    Thus, Defendant Goldenberg, and also his wife Defendant Sullivan, stood to directly and personally benefit from the Company's licensing or independent commercialization of IMMU-132.  This motive became all the more explicit with the Company's hasty agreement for

---

[5]http://patft.uspto.gov/netacgi/nphParser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO
%2Fsearch-bool.html&r=0&f=S&l=50&TERM1=IMMU
132&FIELD1=&co1=AND&TERM2=&FIELD2=&d=PTXT. Last visited June 17, 2020.

the sale of IMMU-132 to Seattle Genetics before Defendants Sullivan and Goldenberg's control and influence over the Company was diluted by venBio's new slate of directors.

147.    Moreover, Defendants Goldenberg and Sullivan both stood to gain personally and directly by any increase in Company stock prior to their selling of Company stock, and they exploited the ASCO Effect to in fact sell their stock at artificially inflated prices.

## The Individual Defendants Once Again Take Advantage of the ASCO Effect, Even After Breaching ASCO Confidentiality and Embargo Policies

148.    The Company's prospects as a research and development business depended on Immunomedics' ability to maintain high stock prices and attract licensing partners to take IMMU-132 through Phase 3 trials, FDA approval, and commercially market its product. The success of IMMU-132, as outlined above, would also mean the success of Defendants Goldenberg and Sullivan in particular, who would profit of Goldenberg's numerous patents connected to IMMU-132. The ASCO Effect was paramount to this goal.  Even before the Relevant Period began, investors were primed to expect new and never-before-disclosed results by Immunomedics regarding IMMU-132 at the 2016 ASCO Meeting.

149.    On April 19, 2016, after the market closed, Immunomedics issued a press release titled "Immunomedics Reports Sacituzumab Govitecan (IMMU-132) Shows Significant Clinical Activity in Metastatic Urothelial Cancer," announcing results for IMMU-132 in metastatic urothelial cancer and announcing that the Company would present updated results for IMMU-132 in TNBC and non-small-cell lung cancers "at two Clinical Science Symposia during the upcoming ASCO Annual Meeting in June."  The press release stated, in relevant part:

> Immunomedics . . . today announced that sacituzumab govitecan, its lead investigational antibody-drug conjugate (ADC), produced meaningful clinical benefit in patients with relapsed or refractory metastatic urothelial cancer.  Among

the 19 patients enrolled into the open-label Phase 2 study, at the time of analysis the interim median PFS was 6.9 months, based on RECIST 1.1, and interim mean OS was 11.4 months, with 84% of patients still alive.  Expression of Trop-2, a cell-surface protein targeted by the ADC, is not a pre-selection criterion for patient enrollment. . . .

"To put these results with IMMU132 in perspective, multiple chemotherapy regimens have been reported to produce PFS of 2 to 5 months and OS of 4 to 9 months in the second or third line setting of metastatic urothelial cancer1," commented Scott T. Tagawa, M.D., Medical Director, Genitourinary Oncology Research Program, Weill Cornell Medicine/NewYork Presbyterian Hospital, New York, NY, who presented the updated results at the AACR conference.

Of the fourteen assessable patients who had received a median of 2 (range, 1 – 5) prior lines of chemotherapy, seven patients reported a partial response as their best response, yielding an interim ORR of 50%.  Importantly, six of the seven responding patients (86%) had been confirmed with a follow up computed tomography (CT) scan, four of whom are continuing with their treatment.

As has been reported by us in patients with other types of solid cancer, sacituzumab govitecan also has an acceptable interim safety profile in 13 urothelial cancer patients reported at AACR.  The notable adverse events were Grade 3 or 4 neutropenia and febrile neutropenia in 31% and 15% of patients, respectively.  Severe diarrhea, commonly reported with irinotecan, was rare, with only 8% Grade 3/4 incidents.  More importantly, repeated doses can be given over months without evoking interfering antisacituzumab govitecan antibodies from patients' own immune system.

150.    The Company also announced that it would present updated results for its treatments of TNBC and non-small-cell lung cancers (i.e., IMMU-132) at the ASCO Meeting, stating, in relevant part:

"We are very encouraged by these results in metastatic urothelial cancer, which warrant a regulatory strategy similar to triple-negative breast cancer should these results continue to be robust," remarked Cynthia L. Sullivan, President and Chief Executive Officer. *"Updated results in triple-negative breast and non-small-cell lung cancers will be presented at two Clinical Science Symposia during the upcoming ASCO Annual Meeting in June."*

Sacituzumab govitecan has received Breakthrough Therapy designation from the FDA for the treatment of patients with triple negative breast cancer who have failed prior therapies for metastatic disease.

(Emphasis added.)

151.    However, Immunomedics would soon breach the ASCO embargo by presenting information contained in one of their abstracts for presentation at ASCO at a conference prior to the ASCO Meeting; and (2) the Company's scheduled presentation at the ASCO meeting, at least with respect to the abstract or IMMU-132 for TNBC, would not contain any materially new updated results because their presentation at a conference preceding ASCO would contain materially the same data, contents, conclusions, and/or information.

152.    On April 29, 2016, Defendant Goldenberg presented updated interim Phase 2 results, including objective durable responses with IMMU-132 in a number of patients with advanced, metastatic solid cancers, after failing multiple therapies at PEGS Boston conferences held in April 2016.

153.    The same day, on April 29, 2016, Immunomedics issued a press release providing positive responses of IMMU-132 in patients, noting that "objective durable responses have been achieved with [IMMU-132], its lead antibody-drug conjugate (ADC), in a number of patients with advanced, metastatic solid cancers, after failing multiple prior therapies, some including checkpoint inhibitors (CPIs)."

154.    The press release additionally noted that Defendant Goldenberg had presented "updated, interim Phase 2 results" for IMMU-132 at PEGS.  The press release also provided specific data regarding treatment responses for IMMU-132 for the treatment of mTNBC, non-small-cell lung cancer, small-cell lung cancer, and urothelial cancer, and provided a summary of those results.

155.    The press release, however, despite presenting further results and data that was presented by Defendant Goldenberg, failed to state that at least some of this information was the same as the information that was to be presented at the ASCO Meeting.

156.    As noted herein, Defendants Goldenberg and Sullivan sold a combined approximately $5 million worth of Immunomedics stock while its price was artificially inflated. The timing of the sales is noteworthy, as all the sales occurred after the June 3, 2016 news broke that the Company's abstract for IMMU-132 for the treatment of TNBC would be removed from the ASCO Meeting, and before the June 24-25, 2016 Best of ASCO Program.  On the day the news about the abstract broke, the Company issued a press release where Defendant Sullivan stated that she and the presenter of the abstract were "attempting to reverse this with ASCO, because we believe the patient population and results reported in April were different from those in the ASCO abstract submitted last February," thus providing investors with hope that new and updated results actually existed.

157.    Defendants Goldenberg and Sullivan, however, along with the other Individual Defendants, knew that this was not the case and that the price of Company stock would continue to decline as the investing public would come to realize that the Company did not have any new and updated results and thus would not be presenting at the Best of ASCO Program.  Before the investing public came to realize that the Company actually would not be presenting at the Best of ASCO Program, Defendants Goldenberg and Sullivan sold a considerable amount of stock to receive almost $5 million in the aggregate before it could become worth much less.  This was only the second time since acquiring their Immunomedics shares that Defendants Sullivan and Goldenberg made such sales of Company stock.

- 53 -

**The Company Actively Touts Prospects of IMMU-132**

158.    At all relevant times, the Company's ADC business was its most important component and it was of critical importance to the Company's success to commercialize IMMU-132, its lead product candidate.

159.    In fact, Adam Feuerstein, writing for the *TheStreet*, noted in a January 25, 2017 article that, "Immunomedics has been for sale for quite some time.  The asset of interest to potential buyers is the experimental triple-negative breast cancer drug IMMU-132. (The rest of the company's pipeline essentially being offered for free.)"

160.    As discussed further herein, during the False Statements Relevant Period the Company repeatedly emphasized IMMU-132 and its ADC business in press releases, SEC filings, and earnings calls.  The Individual Defendants were at all relevant times aware of IMMU-132 developments and all matters affecting IMMU-132.

161.    In line with the Company's consistent focus in press releases and earnings calls on its ADC business and IMMU-132 in the treatment of TNBC, the Company prominently stated in its Form 10-Q filed with the SEC on May 4, 2016:

> Immunomedics is a clinical-stage biopharmaceutical company developing monoclonal antibody-based products for the targeted treatment of cancer, autoimmune disorders and other serious diseases. Our advanced proprietary technologies allow us to create humanized antibodies that can be used either alone in unlabeled or "naked" form, or conjugated with radioactive isotopes, chemotherapeutics, cytokines or toxins. Using these technologies, we have built a pipeline of eight clinical-stage product candidates.
>
> Our portfolio of investigational products includes antibody-drug conjugates ("ADCs") that are designed to deliver a specific payload of a chemotherapeutic directly to the tumor while reducing overall toxicities that are usually found with conventional administration of these chemotherapeutic agents. Our most advanced ADCs are sacituzumab govitecan ("IMMU-132") and labetuzumab govitecan ("IMMU-130"), which are in Phase 2 trials for a number of solid tumors and

metastatic colorectal cancer ("mCRC"), respectively. Sacituzumab govitecan has received Breakthrough Therapy Designation from FDA for the treatment of patients with triple-negative breast cancer ("TNBC") who have failed at least two prior therapies for metastatic disease.

**The Individual Defendants' Reckless Mismanagement with Regard to ASCO**

162.    The Individual Defendants also breached their fiduciary duties by recklessly mismanaging the Company and preventing it from participating in the ASCO Meeting and the Best of ASCO Program, which was of significant importance to the prospects of IMMU-132, and thus, the Company's health and future success.

163.    Alarmed by the reckless mismanagement of the Company, in November 2016, venBio, the Company's largest shareholder at the time, submitted four new candidates for election to the Board at the forthcoming annual meeting of shareholders, then set for December 14, 2016. The proxy contest would soon result in a number of intense legal battles between venBio, the Company, certain of the Individual Defendants, and third-parties and expose further breaches of the Individual Defendants as they engaged in and caused the Company to engage in the Entrenchment Actions during the Relevant Period.

164.    A January 11, 2017 open letter from venBio to Immunomedics shareholders noted that the Company was "ejected from the prestigious American Society of Clinical Oncology . . . for breaking the conference's data embargo." A June 10, 2016 article published on *The Motley Fool* elaborated, noting that the Company's "planned presentation at the [ASCO Meeting] was canceled after ASCO discovered that data intended for ASCO had been disclosed by Immunomedics management in April. The data disclosure violated ASCO's strict policy on embargoing presentations, leading investors to rush for the exits."

- 55 -

165.    As noted in a January 10, 2017 investor presentation by venBio titled, "The Case for Change at Immunomedics, Inc. (IMMU)," Immunomedics management's missteps concerning the ASCO Meeting directly contributed to the Company's underperformance.  The presentation noted that the Company's stock price fell 62% from the date their abstract was ejected from the ASCO Meeting to the end of June.  The presentation also cited a June 3, 2016 analyst report by Jefferies, which maintained that the removal of the Company's abstract for IMMU-132 for TNBC from the ASCO Meeting was in part a function of "potential poor management decision, rather than a negative reflection on [IMMU-132]."

166.    In breach of their fiduciary duties, the Individual Defendants' recklessly mismanaged the Company and caused it significant, unnecessary harm by attempting to present data at the ASCO Meeting that it knew to be old and already presented.  The Individual Defendants' reckless mismanagement is even more apparent in the fact that they chose to present the information in question at a conference that could not have brought them the significant benefits that the ASCO Meeting provides.  Moreover, the same failures that led to their removal from the ASCO Meeting also prevented them from presenting in the Best of ASCO Program, resulting in another important missed opportunity and greater harm to the Company.

**Materially False and Misleading Statements Issued During the False Statements Relevant Period**

*May 2, 2016 Press Release*

167.    On May 2, 2016, Immunomedics issued a press release touting its abstract containing new information on IMMU-132 in patients with TNBC, announcing that it had been selected as part of the "Best of ASCO Program" to be held on June 24-25, 2016, which features the top abstracts from the ASCO Meeting for their practice changing research,  The "Best of

ASCO" designation is seen as a highly prestigious honor and is highly coveted, ultimately raising the visibility and allure of any company selected.

168.    In touting its abstract on IMMU-132 in patients with TNBC and the "significant impact" of IMMU-132's results in those patients, the press release stated, in relevant part:

> Immunomedics . . . **today announced that the abstract on sacituzumab govitecan (IMMU-132), the Company's lead antibody-drug conjugate (ADC), in patients with triple-negative breast cancer (TNBC) has been selected as part of the Best of ASCO Program**, which features the top abstracts from this year's ASCO Annual Meeting for their practice changing research.
>
> "We are honored to receive **this important recognition from our peers at ASCO for the significant impact our results to-date** with the anti-Trop-2-SN-38 conjugate have in patients with TNBC," commented Cynthia L. Sullivan, President and Chief Executive Officer of Immunomedics.  "We are working diligently to make this valuable asset available expeditiously to fill the unmet need of these patients, including our out-licensing efforts for future clinical developments and commercialization in this and other difficult-to-treat solid cancer indications," she further remarked.
>
> **The Best of ASCO Program will be held at the Palmer House Hilton in Chicago, Illinois, from June 24–25, 2016**.  The Company's presentation is scheduled at the Breast Cancer— TripleNegative/Cytotoxic Chemotherapy/Local Therapy Session for Friday, June 24 at 9:00 am – 9:40 am Central Time.

169.    The importance of presenting the Best of ASCO Program was a notable honor for selected companies and no doubt enhanced the visibility of those companies even beyond what the ASCO Meeting provided. Indeed, the Best of ASCO Programs has been described as follows:

> The Best of ASCO Meetings condense the most cutting-edge science and education from the world's premier oncology event, the ASCO Annual Meeting, into a two-day program. The abstracts chosen for presentation and discussion reflect the foremost research and strategies in oncology that will directly impact patient care.[6]

---

[6]https://www.sumocancer.org/index.php?option=com_jevents&task=icalrepeat.detail&evid=6&Itemid=1 15&year=2019&month=07&day=26&title=best-of-asco meeting&uid=6971aad2c556168566a592211d711f31. Last visited June 17, 2020.

170.   Indeed, the impact of the Company's announcement resulted in an increase in Immunomedics' share price of approximately 2%, or $0.70, from a closing price of $3.68 on May 2, 2016 to close at $3.75 on May 3, 2016. However, at this point, it was unclear to the investing public that the Company had already disclosed substantially the same information, data, results, and/or conclusions in Defendant Goldenberg's PEGS presentation, as well as in the Company's press release issued the same day on April 29, 2016. Thus, investors were unaware that Immunomedics already faced a heightened risk that it would be prevented from presenting its IMMU-132 TNBC results at the ASCO meetings in June 2016.

171.   The statements made on May 2, 2016 were materially false and misleading, causing the Company's stock to be artificially inflated thereby, as the Individual Defendants were well aware that the IMMU-132 TNBC results in Immunomedics' abstract submitted to ASCO had already been materially disclosed and presented in April 2016 and the Company and the Individual Defendants would not be supplying any updated or new information at the forthcoming ASCO Meeting or the Best of ASCO Program.

### *May 4, 2016 Press Release*

172.   On May 4, 2016, Immunomedics issued a press release announcing the Company's fiscal results and clinical program developments for its 2016 third quarter ended March 31, 2016. The press release specifically announced that "key updates" in triple-negative breast cancer and non-small-cell and small-cell lung cancers would be provided at the ASCO Meeting, stating, in relevant part:

> "Our current estimated expenses and cash flows are tracking close to the low end of our fiscal 2016 guidance," commented Peter P. Pfreundschuh, Vice President Finance and Chief Financial Officer.  "We believe FDA's Breakthrough Therapy Designation in triple-negative breast cancer is recognition of the significant

potential of sacituzumab govitecan, which continues to produce encouraging safety and efficacy results in a number of difficult-to-treat solid cancers.  We are very encouraged by the results in metastatic urothelial cancer, as recently reported by our clinical investigator at the AACR Annual Meeting. ***Key updates in triple-negative breast cancer, as well as non-small-cell and small-cell lung cancers will be provided at ASCO next month***, added Mr. Pfreundschuh.

**The Company's key clinical developments and future planned activities:**

Sacituzumab Govitecan (IMMU-132)

- The anti-Trop-2-SN-38 conjugate has received Breakthrough Therapy Designation from the FDA for the treatment of patients with triple-negative breast cancer (TNBC) who have failed at least 2 prior therapies for metastatic disease.

* * *

- ***Updated Phase 2 results in patients with metastatic triple-negative breast cancer will be presented in a Clinical Science Symposium Session at the 2016 American Society of Clinical Oncology (ASCO) Annual Meeting on Friday, June 3, 2016.***

- ***At the same ASCO meeting, results in patients with metastatic small-cell lung cancer will be updated in a poster session on Saturday, June 4, 2016.***

- ***In addition, updated results focusing on patients with metastatic non-small-cell lung cancer will be reported in another Clinical Science Symposium Session at the ASCO conference on Monday, June 6, 2016.***

(Emphasis added.)

173.    The press release failed to invalidate that "***updated*** Phase 2 results in patients with metastatic triple negative breast cancer will be presented in a Clinical Science Symposium Session at the 2016 American Society of Clinical Oncology (ASCO) Annual Meeting on Friday, June 3, 2016."

***May 4, 2016 Form 10-Q***

174.    Also on May 4, 2016, the Company filed a Form 10-Q with the SEC for their third fiscal quarter ended March 31, 2016 (the "3Q 2016 10-Q"), signed by Defendants Sullivan and Pfreundschuh, and reporting in greater detail the Company's operating and financial results for the quarter ended March 31, 2016.  The 3Q 2016 10-Q reported a net loss of $14 million, or $0.15 per diluted share, on revenue of $0.9 million, compared to a net loss of $11.76 million, or $0.13 per diluted share, on revenue of $1.18 million for the same period in the prior year.

175.    The 3Q 2016 10-Q additionally provided updates on IMMU-132, stating, in relevant part:

> Results in TNBC [triple-negative breast cancer], NSCLC [non-small-cell lung cancer], and SCLC [small-cell lung cancer] were updated by Dr. David M. Goldenberg who was invited to present at PEGS Boston 2016 in April.  Treatment responses, assessed by CT according to the rules set by the RECIST 1.1, are summarized in the table below.  These results include objective response rate ("ORR"), PFS, and OS.

| Cancer Type | # of Assessable Patients(a) | % ORR (% Confirmed) | Median PFS(c) (% Maturity) | Median OS (% Maturity) |
|---|---|---|---|---|
| TNBC | 58 (5, 2 – 12) | 34% (75%) | 5.7 months (62%) | Not Reached |
| NSCLC | 32 (3, 1 – 7) | 31% (30%) | 3.9 months (68%) | Not Reached |
| SCLC | 26 (2.5, 1 – 5) | 23% (50%) | 2.1 months (82%) | 8.1 months (54%) |
| UC | 14 (2, 1 – 5) | 50% (100%) | 6.9 months (47%) | 11.4 months (16%) |

176.    Attached to the 3Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Sullivan and Pfreundschuh attesting to the accuracy of the 3Q 2016 10-Q.

177. The aforementioned statements made on May 4, 2016 were materially false and misleading, causing the Company's stock to be artificially inflated thereby, as the Individual Defendants were well aware, but failed to disclose, that the IMMU-132 TNBC results disclosed and presented in April 2016 contained substantially the same information, content, and/or conclusions as those contained in Immunomedics' abstract submitted to ASCO and the Individual Defendants would not be supplying any updated or new information at the forthcoming ASCO Meeting or the Best of ASCO Program.

**May 5, 2016 Conference Call**

178. On May 5, 2016, Immunomedics hosted an earnings conference, discussing the Company's financial results for its third quarter 2016 and again promoting its scheduled presentation at the ASCO Meeting and touting IMMU-132. During the call, Defendant Sullivan touted Immunomedics' IMMU-132 abstract on TNBC that was at the time set to be included in and presented on at the ASCO Meeting and Best of ASCO Conference, stressed IMMU-132's BTD, the Company's desire for a licensee, and again noted "key updates," stating, in relevant part:

> **Key updates in triple-negative breast cancer, as well as non-small cell, and small cell lung cancers will be provided at ASCO next month.**

> * * *

> More importantly, the breakthrough therapy designation has opened up the possibility of a potential accelerated approval for IMMU-132 in TNBC, which is one of the topics we will be addressing with FDA during a follow-on meeting we've scheduled this month. If accelerated approvals [are] granted, IMMU-132 could be available and help fill the unmet need of patients with relapse for refractory TNBC, before the Phase 3 trial would be completed. **As was recently announced, our peers at the American Society of Clinical Oncology or ASCO selected our IMMU-132 abstract on TNBC, as part of their best of ASCO program, which features the top abstract from this year's ASCO Annual Meeting for "practice changing research." That will be held at a later date. At the ASCO Meeting, our oral presentation on TNBC will be at a Clinical Science Symposium Session on breast**

> *cancer.*  Additionally, our abstract in patients with non-small cell lung cancer has also been selected for oral presentation at another Clinical Science Symposium session that focuses on lung cancer.  Second only to a plenary session, these Clinical Science Symposium sessions are an important part of the ASCO program for companies to showcase the strength of their clinical data, in terms of applicability of their product candidates and clinical practice.

(Emphasis added.)

179.   During the conference call, Defendant Goldenberg also discussed the progress of IMMU-132 for TNBC and the Company's, at the time, upcoming presentation at the ASCO Meeting regarding the same.  He stated, in relevant part:

> We cannot compute overall survival yet, because as of December 2015, 83 patients were still alive.  ***However, we hope to update these results at the forthcoming Annual Meeting of the American Society of Clinical Oncology or ASCO, where [indiscernible] will make an oral presentation on our results in TNBC***.

(Emphasis added).

180.   As the anticipation grew with the investing public upon the Company's purportedly forthcoming updates provided during the call, the price per share of Immunomedics stock increased approximately 11.5% , or $0.40 over the next two trading days, from closing at $3.46 per share on May 5, 2016 to close at $3.86 per share on May 9, 2016.

181.   The statements made on May 5, 2016 were materially false and misleading, causing the Company's stock to be artificially inflated thereby, as the Individual Defendants were well aware, but failed to disclose, that the IMMU-132 TNBC results disclosed and presented in April 2016 contained substantially the same information, content, and/or conclusions as those contained in Immunomedics' abstract submitted to ASCO and the Individual Defendants would not be supplying any updated or new information at the forthcoming ASCO Meeting or the Best of ASCO Program.

   ***May 19, 2016 Press Release***

- 62 -

182.    On May 19, 2016, Immunomedics issued a press release announcing additional information on the Company's participation at the ASCO Meeting, noting that the Company was to present two abstracts, including its abstract involving updated results from a Phase 2 study of the Company's antibody-drug conjugate in patients with mTNBC, and give one presentation, each regarding IMMU-132.   The press release stated, in relevant part:

> **Immunomedics, Inc.**, **(Nasdaq: IMMU)** today announced that the Scientific Program Committee of the ***American Society of Clinical Oncology (ASCO) has selected two of the Company's abstracts for oral presentation at two Clinical Science Symposium Sessions during their 2016 Annual Meeting***, scheduled for June 3-7, 2016 at McCormick Place Convention Center in Chicago, Illinois.
>
> Both abstracts are on sacituzumab govitecan, or IMMU-132, the Company's lead antibody-drug conjugate (ADC). Sacituzumab govitecan has previously been designated by the FDA a Breakthrough Therapy for the treatment of patients with triple-negative breast cancer (TNBC) who have failed prior therapies for metastatic disease.
>
> ***The first abstract is a Late-Breaking Abstract on updated results from a Phase 2 study of the ADC in patients with metastatic TNBC. This abstract has also been selected as part of the Best of ASCO Program, which features the top abstracts from this year's ASCO Annual Meeting for their practice changing research.***

(Emphasis added).

183.    The press release provided the dates, time, location and title of each presentation.

184.    On more positive news, the price per share of Company stock increased another 8.3%, or $0.32 from closing at $3.85 per share on May 18, 2016 to close at $4.17 on May 19, 2016. Still, investors remained in the dark about the Defendants' breach of ASCO's disclosure and embargo policies and the substantial risk of ejection from the ASCO meetings that Immunomedics faced.

185.    The statements made on May 19, 2016 were materially false and misleading, causing the Company's stock to be artificially inflated thereby, as the Individual Defendants were

well aware, but failed to disclose, that the IMMU-132 TNBC results disclosed and presented in April 2016 contained substantially the same information, content, and/or conclusions as those contained in Immunomedics' abstract submitted to ASCO and the Individual Defendants would not be supplying any updated or new information at the forthcoming ASCO Meeting or the Best of ASCO Program.

186.    The price per share of Immunomedics stock continued to climb by approximately 27%, or $1.13 as the ASCO Meeting scheduled for June 2016 approached, from closing at $4.17 per share on May 19, 2016 to close at $5.30 on June 2, 2016. Overall, from the time the Company first announced its anticipated presentations at the ASCO conferences on April 19, 2016, until June 2, 2016, the Company's stock price climbed approximately 80% from closing at $2.95 per share on April 19, 2016, to close at $5.30 per share on June 2, 2016.

187.    The statements referenced above in ¶¶ 167-68, 172-76, 178-79, and 182-83 were materially false and misleading because they failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Immunomedics had misrepresented to ASCO and the investing public that it had new Phase 2 results for IMMU-132's treatment of refractory/relapsed mTNBC that it was to unveil at the ASCO Meeting and the Best of ASCO Program, when it did not; (2) in reality, the abstract for IMMU-132 that Immunomedics submitted to ASCO for presentation at the ASCO Meeting contained substantially the same data, information, content, and/or conclusions that the Company previously presented at the PEGS

conference in Boston, disclosed in conference calls and on the Company's own website, in violation of ASCO's embargo; (3) as such, the Company faced a substantial risk that it would likely be excluded from presenting at the ASCO conferences; and (4) the Company failed to maintain effective internal controls.

## The Truth Begins to Emerge

### *Abstract Removed from the ASCO Meeting*

188.    By June 2, 2016, just before the scheduled ASCO Meeting, ASCO had discovered that the Company's abstract contained previously disclosed information and/or data and ejected the Company's abstract and impending presentation from the ASCO Meeting. On June 2, 2016, after the market closed, media outlets reported that ASCO had removed an abstract and scheduled presentation by Immunomedics regarding IMMU-132's treatment of TNBC from the ASCO Meeting.  According to ASCO, Immunomedics misrepresented that the Company's abstract for IMMU-132 contained updated and previously undisclosed results from a mid-stage study when, in fact, the IMMU-132 data that Immunomedics submitted was not only not new, but it was also previously observed and presented.  This was in violation of ASCO policy. As the Individual Defendants were aware at all relevant times that this was the case, the statements they made and/or caused the Company to make were false and misleading at the time they were made, since acceptance into the ASCO Meeting indicated that new data would be presented there.

### *June 3, 2016 Press Release*

189.    On June 3, 2016, the Company issued a press release confirming that its abstract on IMMU-132 for TNBC and its related oral presentation were expelled from the ASCO Meeting. The press release stated, in relevant part:

[T]he Company was advised late yesterday that its abstract, "Therapy of refractory/relapsed metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results," planned for oral presentation today and selected by the American Society of Clinical Oncology (ASCO) for its Press Briefing, was cancelled because of a complaint that the Company violated the embargo by reporting results presented by its Chairman at a conference in April. It appears the complaint was made by a third party contacting ASCO. No question was raised on the quality of the results.

Immunomedics President and Chief Executive Officer, Cynthia L. Sullivan, remarked: "***The presenter, Dr. Bardia, and I are attempting to reverse this with ASCO, because we believe the patient population and results reported in April were different from those in the ASCO abstract submitted last February*** . . . ."

(Emphasis added.)

190.    The statements made on June 3, 2016 were false and misleading because: (1) the data, results, information, content and/or conclusions previously presented and disclosed by the Company and the Individual Defendants were not materially different from those contained in the Company's abstract concerning the IMMU-132 TNBC results; (2) Dr. Bardia was not informed that the results and data had previously been disclosed and did not hold the belief represented in the press release that the patient population and results reported in April were different from those he would have presented at the ASCO Meeting; and (3) the press release implied that there was still a basis for the Company's abstract to be presented at the upcoming Best of ASCO Program scheduled for June 24, 2016.

***Financial Media Response***

191.   The financial media response was swift.   As noted in a June 3, 2016 article published by CNAFinance[7]:

> When negative news is released, we can expect to see declines.  In this particular case, the news that was released was overwhelmingly negative.  When it comes to clinical oncology, it is incredibly important for companies in the field to be part of the community.  The fact that Immunomedics was told that it will not be allowed to provide its demonstration is incredibly bad news.  So naturally, we're seeing heavy declines in the value of the stock at the moment.

192.   On June 3, 2016, *TheStreet* published an article titled "Immunomedics Kicked Out of Prestigious ASCO Cancer Conference," exploring in depth Immunomedics' violation of ASCO policy.  The article noted that the Company violated ASCO's rules when it was "caught trying to sneak old, previously presented clinical on [IMMU-132 for TNBC] into the [ASCO Meeting]," and its abstract regarding the same was removed from the meeting."  The article stated, in relevant part:

> Immunomedics [ ] was caught trying to sneak old, previously presented clinical data on its triple-negative breast cancer drug IMMU-132 into the American Society of Clinical Oncology (ASCO) annual meeting, which starts Friday.
>
> That's a violation of ASCO's rules. As a result, ASCO informed Immunomedics Thursday that the IMMU-132 breast cancer abstract was removed from the meeting.
>
> "Since the confidentiality of this abstract was violated, the abstract and presentation have been removed from the meeting and will no longer be featured in our press program," Alise Fisher, program coordinator in ASCO's science communications department, said in an email Thursday night.

193.   *TheStreet* article also noted that the Company's "screw-up was entirely self-inflicted," and that the Company had already presented information contained in the removed abstract at a previous "industry networking meeting in April."  The article stated, in relevant part:

---

[7] *See* "Immunomedics (IMMU) Stock Falls Hard On ASCO News," CNAFinance.com, June 3, 2016, *at* http://cnafinance.com/immunomedics-immu-stock-falls-hard-on-asco-news/9357.

ASCO accepted the company's late-breaking abstract for IMMU-132 into the annual meeting on the premise that it contained updated and previously undisclosed results from a mid-stage study in triple-negative breast cancer.  But Immunomedics failed to tell ASCO that the IMMU-132 data were not updated or new at all.

Immunomedics Founder and Chief Scientific Officer David Goldenberg had already presented the same IMMU-132 trial results at an industry networking meeting in April, ASCO learned.

The company issued a press release when these IMMU-132 data were presented in April, posted the presentation slides on its web site and discussed the data with investors on a conference call.

194.    Notably, *TheStreet* article revealed that Defendant Sullivan's comment in the Company's June 3, 2016 press release that, "The presenter, Dr. Bardia, and I are attempting to reverse this with ASCO, because we believe the patient population and results reported in April were different from those in the ASCO abstract submitted last February," was wildly misleading or outright untrue, since, per an interview with Dr. Aditya Bardia himself, the Company never told him about the data reveal at the prior conference.  *TheStreet* article stated, in relevant part:

Immunomedics also never told Dr. Aditya Bardia of Harvard Medical School, the principal investigator of the IMMU-132 breast cancer study and the scheduled ASCO presenter, about the April data reveal, Bardia told me in an interview on Wednesday.

195.    The article additionally discussed the influence of the ASCO Meeting and the Company's efforts to "play up" the importance of the Company's IMMU-132 presentation, noting that such efforts resulted in a 70% stock increase since ASCO officially announced the abstract's inclusion in the ASCO Meeting.  The article stated, in relevant part:

Investors look to the ASCO meeting, held in June each year, for the latest developments and newest clinical data on experimental cancer drugs.

On a recent conference call with investors, Goldenberg and his wife, Immunomedics CEO Cynthia Sullivan, played up the importance of the IMMU-132 ASCO presentation.  Coupled with the Breakthrough Therapy Designation

granted to the drug by FDA in February, the company hopes to win approval of its first drug after 34 years of research efforts. . . .

Immunomedics stock price has risen by 70% since April 20, when ASCO announced the inclusion of the IMMU-132 breast cancer data as part of its media briefing program for the annual meeting.

But unbeknownst to ASCO and investors, the updated IMMU-132 data hyped by Immunomedics executives turned out to be old and previously seen. For that transgression, Immunomedics was kicked out of the most prestigious and closely watched cancer conference of the year.

196.     ASCO's policies clearly provide that it solely accepts submissions that evidence new information and results, and that "[t]he contents and conclusions of the abstract must not be presented at any scientific, medical or educational meeting of 500 registrants or more or be published in a scientific, medical or educational publication (in any medium), in whole or in part, before the ASCO Meeting."[8]

197.     Immunomedics violated this policy by publicly presenting its findings in April 2016.  The Company attempted to deceive not only ASCO organizers, but also shareholders.  The Individual Defendants caused the Company to repeatedly and deceptively reference new results to be presented at the ASCO Meeting despite the fact that the results to be presented were not in fact new.

198.     As a result of this news, Immunomedics shares fell $0.78, or 14.7%, to close at $4.52 per share on June 3, 2016.  As the market continued to absorb the impact of the June 3, 2016 announcements, the price of Immunomedics' shares continued to decline, closing at $3.13 per share on June 9, 2016. Before the Company's shares reflected the full revelation of the truth,

---

[8] Available at http://am.asco.org/policies-and-exceptions.

Defendants Goldenberg and Sullivan, as outlined above, sold approximately 1.45 million shares between June 6, 2016 and June 13, 2016 at prices ranging from $3.02 and $4.09 per share.

### July 21, 2016 – Pfreundschuh Resignation and Stock Downgrade

199.    On June 21, 2016, the Company filed a Form 8-K with the SEC announcing that Defendant Pfreundschuh had resigned.

200.    On June 21, 2016, an analyst at Wells Fargo & Co. downgraded shares of the Company from an "outperform" rating to a "market perform" rating, and stated that it was "reducing our valuation range to $1.75 to $2.25 (from $8 - $9) following today's news and a series of management missteps that have shaken our confidence in IMMU's ability to create sustainable shareholder value."

201.    As a result of this news, Immunomedics shares fell $0.13, or 5.1%, from closing at $2.53 per share on June 20, 2016 to close at $2.40 per share on June 22, 2016.

### The Truth Fully Emerges

### The Best of ASCO Program

202.    On June 24, 2016, the day Immunomedics was scheduled to present and did not, the price of Immunomedics stock fell over 13%, or $0.33, from the prior trading day's closing price of $2.50 per share on June 23, 2016 to close at $2.17 per share on June 24, 2016.

203.    On June 25, 2016, the Best of ASCO Program had concluded and Immunomedics, contrary to their prior statements and the hope offered in its June 3, 2016 press release, did not give a presentation during the Best of ASCO Program. The Company failed to provide an explanation as to why it could not reverse ASCO's decision and present at the Best of ASCO Program, or why it could not substantiate their June 3, 2016 claim that the data they were to present

at the ASCO Meeting and Best of ASCO Program was different from the data that ASCO found to violate its embargo.

204.    ASCO publicly confirmed its Notice of Retraction on its website in the Journal of Clinical Oncology, disclosing what the Individual Defendants failed to admit, in relevant part:

"Therapy of relapsed/refractory metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results." ASCO's Confidentiality Policy requires that abstracts be considered confidential and embargoed from the time of submission until the findings have been publicly released in conjunction with the ASCO Annual Meeting. Abstract LBA509, published in the 2016 ASCO Annual Meeting Proceedings Part II, violated this policy and was retracted from publication and presentation at the 2016 ASCO Annual Meeting.[9]

205.    As a result of the investing public becoming increasingly aware that the Company did not have new or updated results for IMMU-132 for the treatment of TNBC, Immunomedics shares fell $0.17, or 7.8%, from the previous day's closing price to close at $2.00 per share on June 27, 2016, the next day the market was open after the Best of ASCO Program concluded. In total, between June 2, 2016 and June 27, 2016, the Company's stock experienced an aggregate loss of 62.3%, or $3.30, from closing at $5.30 per share on June 2, 2016 to close at $2.00 per share on June 27, 2016.

206.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

207.    Moreover, in further breach of their fiduciary duties, the Individual Defendants failed to timely correct these false and misleading statements and/or omissions of material fact.

---

[9] https://ascopubs.org/doi/abs/10.1200/JCO.2016.34.18_suppl.LBA509. Last visited June 17, 2020.

208.    The Individual Defendants additionally breached their fiduciary duties by recklessly mismanaging the Company and preventing it from participating in the ASCO Meeting and the Best of ASCO Program.

209.    According to the Second Amended Consolidated Complaint in the Securities Class Action (the "SAC"), defendants maintained that the abstract titled "Efficacy and Safety of Anti-Trop-2 Antibody Drug Conjugate Sacituzumab Govitecan (IMMU-132) in Heavily Pretreated Patients With Metastatic Triple-Negative Breast Cancer" which was published in March 2017, is the same abstract the Company intended to present at the ASCO conferences in June 2016. According to the SAC, the bottom of that abstract contains an explicit admission that the data and information presented therein had indeed been presented at PEGS in Boston, which took place between April 25-29, 2016 and *two additional conferences* from November and December 2015. The SAC provides the following snapshot:

*Prior Presentation*

Presented at the AACR-NCI-EORTC International Conference on Molecular Targets and Cancer Therapeutics, Boston, MA, November 5-9, 2015; 38th Annual San Antonio Breast Cancer Symposium, San Antonio, TX, December 8-12, 2015; 12th Annual Protein and Antibody Engineering Summit, Boston, MA, April 25-29, 2016 and 39th Annual San Antonio Breast Cancer Symposium, San Antonio, TX, December 6-10, 2016.

8    © 2017 by American Society of Clinical Oncology                                    JOURNAL OF CLINICAL ONCOLOGY

210.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and caused the Company to engage in the Entrenchment Actions outlined below.

**Additional Misconduct During the Relevant Period: The Entrenchment Actions**

211.    Following the ASCO debacle, certain of the Individual Defendants, including Defendants Goldenberg, Kirsch, Markison, Paetzold, Stark, and Sullivan further breached their

fiduciary duties to the Company in their capacity as Board members by engaging in multiple measures to entrench themselves on the Board.

212.    As noted above, by the beginning of 2017, venBio had launched a proxy contest to replace the Company's Board at the time, publicly criticizing Company management and the Board for their failures in managing the Company, including by allowing Immunomedics' abstract to be ejected from the ASCO conferences.

213.    In response, certain of the Individual Defendants manipulated corporate machinery to entrench themselves by postponing the annual meeting and altering the configuration of the Board, while also violating the law by rescheduling the Company's annual meeting of shareholders—twice to fall outside the bounds of Section 211(c) of the Delaware General Corporation Law's requirement to timely convene the annual shareholders' meeting.

214.    On November 28, 2016, to stall the overhaul of the Board, and thereby deny shareholders the opportunity to elect a new Board, the Individual Defendants caused the Company to reschedule its annual meeting of shareholders from December 14, 2016 to February 16, 2017, maintaining in a press release issued the same day that, "in light of venBio Select Advisors LLC's ("venBio") recently nominated slate of four director candidates to the Company's five-member Board, the Board of Directors has determined that the postponement of the Company's 2016 Annual Meeting of Stockholders for a short period is necessary and in the best interest of its stockholders."

215.    In another blatant attempt to stifle and neutralize venBio's nominee slate, on January 9, 2017, the Board elected to expand itself to seven members, adding four new unqualified

directors who had been recommended by the Governance and Nominating Committee, but also leaving Defendants Goldenberg, Sullivan, and Markison on the Board.

216.    A month later, on February 9, 2017, Defendants Goldenberg, Sullivan, and Markison engaged in improper entrenchment by causing the Board to amend the Company's by-laws to call for a plurality voting regime for the election of directors instead of majority voting, and to provide for mandatory advancement of attorneys' fees and costs for the Company's directors and officers.

217.    On February 10, 2017, Defendants Goldenberg, Sullivan, and Markison authorized a joint venture transaction with Seattle Genetics to *sell* IMMU-132, the Company's only commercially viable asset (the "Seattle Genetics Transaction"). The Seattle Genetics Transaction was entered *just four business* days before the scheduled February 16, 2017 annual meeting of shareholders, where venBio's slate of director nominees were to be elected. Then, on the date it announced the Seattle Genetic Transaction, the Company declared that it was rescheduling its 2016 annual meeting yet again, this time from February 16, 2017 to March 3, 2017.

218.    The Seattle Genetics Transaction was well below market value with an upfront payment of $250 million, and an illusory "go-shop" period that was to end immediately after the date of the second rescheduled annual meeting, and limited in scope to those parties previously involved in discussions about a similar transaction to avoid a true market check. Worse, by entering the Seattle Genetics Transaction, the Company failed to complete discussions with at least 18 other interested parties. The rushed nature of the transaction and its poor results reflected Defendants Goldenberg, Sullivan, and Markison's efforts to further entrench themselves on the Board to their own benefit, and at the expense of shareholders.

219.    On February 13, 2017, venBio initiated the venBio Action against, Defendants Goldenberg, Markison, Sullivan, Seattle Genetics, the recently appointed members of the Board at the time, and the Company as nominal defendant, alleging that the Board had breached its fiduciary duties by (a) rescheduling the 2016 annual meeting of shareholders, (b) agreeing to the Seattle Genetics Transaction, and (c) by amending the Company's by-laws to call for a plurality voting regime for the election of directors instead of majority voting and providing for mandatory advancement of attorneys' fees and costs for the Company's directors and officers.

220.    A few days thereafter, in their continued efforts to entrench themselves, on February 17, 2017, Defendants Goldenberg, Sullivan and Markison caused the Company to initiate an action in the United States District Court for the District of Delaware against venBio, seeking to invalidate the proxies solicited by venBio in furtherance of its contest for the election of directors of the Company.

221.    On March 3, 2017, despite significant pushback from the Individual Defendants, the Company's shareholders elected venBio's slate of directors to the Board.

222.    The very next day, Defendants Goldenberg, Markison, and Sullivan made their last attempt to entrench themselves, in direct opposition to the wishes of Immunomedics shareholders, by filing another action in the Court of Chancery of the State of Delaware challenging the results of the election.

223.    By May 2017, in the midst of continued legal disputes, the Company, Seattle Genetics, Goldenberg, Sullivan, Markison and venBio reached a settlement in the venBio Action, Seattle Genetics terminated the transaction to buy IMMU-132, and Defendants Goldenberg and Sullivan were ousted from their positions at the Company.

224.    In all, the Entrenchment Actions have compounded the breaches of fiduciary duty concerning the ASCO conferences and exacerbated the harm on the Company resulting therefrom.

225.    Indeed, in connection with its settlement of the venBio Action, the Company agreed to pay $3.4 million in attorneys' fees and expenses to venBio—which included costs associated with litigating the venBio Action as well as the additional actions the Individual Defendants caused the Company to launch against venBio. As outlined in Immunomedics' most recent quarterly report filed with the SEC on Form 10-Q on May 6, 2020, the Company has also initiated arbitration proceedings with its insurers, due to their refusal to cover the $3.4 million award to venBio. The Company remains a named nominal defendant in the venBio Action, which is currently in discovery.

## DAMAGES TO IMMUNOMEDICS

226.    As a direct and proximate result of the Individual Defendants' conduct, Immunomedics will lose and expend many millions of dollars.

227.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Sullivan, Goldenberg, and Pfreundschuh, the venBio Action filed against the Company, and certain of its former officers and directors, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

228.    Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

229.    Such losses include, but are not limited to, losses of revenues caused by customers' loss of trust in the Company's business and products.

230.    As a direct and proximate result of the Individual Defendants' conduct, Immunomedics has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DEMAND ALLEGATIONS

231.    Plaintiff brings this action derivatively in the right and for the benefit of Immunomedics to redress injuries suffered, and to be suffered, by Immunomedics as a direct result of breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, by the Individual Defendants. Immunomedics is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

232.    Plaintiff is, and has been continuously since before the Relevant Period, an Immunomedics shareholder.

233.    Plaintiff will adequately and fairly represent the interests of Immunomedics and its stockholders in enforcing and prosecuting their rights. Prosecution of this action, independent of the Board, is in the best interests of the Company.

234.    The wrongful acts complaint of herein subject, and will continue to subject, Immunomedics to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

235.    On October 3, 2016, a derivative action was filed by a shareholder of Immunomedics on behalf of the Company against the Individual Defendants in the Superior Court of New Jersey, Morris County, Law Division, Docket No. L-220-16 (the "New Jersey State

Action"). Upon losing standing as a shareholder, the plaintiff to that action was replaced with Plaintiff, who filed an amended complaint on October 16, 2017. On March 29, 2018, Judge Frank J. DeAngelis dismissed the amended complaint without prejudice for failing to plead demand futility, analyzing the allegations under the relevant pleading standards for actions brought "without a request for shareholder action[.]"

236.    On September 21, 2018, Plaintiff, through his counsel, sent a demand on Immunomedics' Board to investigate the violations of law described herein, adopt corporate governance reforms immediately, and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing the Company to issue improper statements set forth herein and for engaging in the Entrenchment Actions, and to assess whether any third parties should be litigated against (the "Demand Letter"). The Demand Letter is attached hereto as Exhibit A.

237.    On October 22, 2018, Plaintiff's counsel received a letter from counsel representing the Board, which acknowledged receipt of the Demand Letter and rejected the demand outright (the "Demand Refusal Letter"). The Demand Refusal Letter made no mention of any investigation; rather, it relied wholly on the  motion to dismiss order entered in the pre-demand New Jersey State Action, which was dismissed without prejudice for failure to plead demand futility.  A copy of the October 22, 2018 Demand Refusal Letter is attached hereto as Exhibit B.

238.    At the time the Board refused Plaintiff's Demand Letter, the Board consisted of the following individuals: Behzad Aghazadeh, Scott Canute, Peter Barton Hutt, Khalid Islam, and Michael Pehl.

239.    The refusal of Plaintiff's demand was improper as the Board did not act reasonably or in good faith.

240.    The Demand Refusal Letter provided no indication that the Board took *any action at all* to evaluate or investigate Plaintiff's demand. The Demand Refusal Letter is void of any details regarding any investigation conducted by the Company such as any documents reviewed, interviews performed, or the appointment of any type of special committee to reasonably conduct an investigation of the allegations of the Demand Letter in good faith.

241.    The Demand Refusal Letter makes no mention of any written report in connection with the Demand or the Board's decision to refuse the Demand. In failing to produce a report, the Company neglected to keep a proper record to allow Plaintiff and the Court to assess the reasonableness of its methodology in refusing the Demand Letter. That the Company failed to issue any report is an incurable mistake to the refusal of the Demand Letter because there is no evidentiary record upon which to determine whether the Board in good faith refused the Demand Letter. The only take away from this is that no investigation was conducted before the Board dismissively rejected the Demand Letter.

242.    What is evident from the Demand Refusal Letter is that the Board's process of evaluating and responding to Plaintiff's Demand Letter was not reasonable nor was the Board's decision informed and made in good faith when it improperly refused the Demand Letter. Instead, the refusal rested on Judge DeAngelis' order in the prior New Jersey State Action. This is improper and inadequate for several reasons. First, the concerns raised in the Demand Letter did not invoke the pleading requirements of a court-filed complaint. Second, Plaintiff's Demand Letter went beyond the allegations in the New Jersey State Action and thus, much of the Demand Letter was

ignored and unaddressed by the Board. Third, although Judge DeAngelis found that Plaintiff failed to meet pleading requirements for some of the allegations in his complaint, Plaintiff, during the New Jersey State Action and at the time of sending the Demand Letter, did not possess the inside information concerning the underlying misconduct alleged in his previous complaint and in the Demand Letter. The Company and the Board, however, were and are in the position to access such information. Therefore, it was appropriate to make a demand on the Board to investigate Plaintiff's concerns, which he did in the Demand Letter, as the Board can review and evaluate company documents. Thus, the Board's reliance in the Demand Refusal Letter on Plaintiff's inability to survive the motion to dismiss in the New Jersey State Action is misplaced.

243.   Moreover, for purposes of Plaintiff's demand, the previously dismissed New Jersey State Action is irrelevant, as Plaintiff at the time of the Demand Letter—was no longer a plaintiff, but was a shareholder and sought for the Board to investigate and take action for alleged wrongdoing that subjected the Company, and continues to subject the Company, to harm.

244.   Accordingly, the Board's response to the Demand Letter was inadequate.

245.   The Board failed to investigate the claims alleged in the Demand Letter, therefore no reasonable investigation occurred in response to the Demand Letter. Rather, the Board assumed that the allegations contained therein had "little likelihood of success" because of the court's dismissal of the New Jersey State Action. Yet, the underlying wrongdoing concerning the ASCO conferences alleged in the New Jersey State Action and the Demand Letter is also the subject of the Securities Class Action. In the Securities Class Action Opinion, the Honorable Judge Hayden denied defendants' motion to dismiss in its entirety, holding that given ASCO's known strict disclosure policies surrounding the content of abstract submissions, "reasonable investors would

continue to expect presentations in June 2016 that revealed new information, beyond the contents of [Immunomedics'] Boston presentation. Under the circumstances . . . an inference may be drawn that defendants' May 2016 statements were false or misleading." The Securities Class Action Opinion further held that, "it can be permissibly inferred that the risk that an investor would be lulled into expecting new results at the ACSO conferences would have been known or obvious to defendants." Securities Class Action Opinion, at 8, 11. Thus, the Company and defendants in the Securities Class Action, some of whom are defendants herein, including Defendants Sullivan, Pfreundschuh, and Goldenberg, face a substantially likelihood of liability from the wrongdoings alleged in the Demand Letter.

246.    Lastly, the Demand Refusal Letter assured Plaintiff, without any evidence, that "[t]he Board is now comprised of a majority of independent directors who are aware of your allegations, and continue to take steps to ensure that the company complies with all of its obligations to shareholders." The Board did not provide any elaboration upon this conclusory statement.

247.    Given the Board's refusal to investigate the wrongdoing, Plaintiff reasonably believes that the Board has failed and will continue to fail to act in good faith, on an informed basis, or in the best interest of the Company. Accordingly, the Board's refusal of the Demand Letter and its unreasonable process in forming a response, including its refusal to investigate the wrongdoing falls outside the protections of the business judgment rule and the action should be allowed to proceed.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

248.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Immunomedics' business and affairs.

250.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

251.     The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Immunomedics.  In breach of their fiduciary duties owed to Immunomedics, the Individual Defendants willfully or recklessly participated in and/or facilitated the Entrenchment Actions and made and/or caused the Company to make false and misleading statements of material fact and failed to disclose that: (1) Immunomedics had misrepresented to ASCO and the investing public that it had new Phase 2 results for IMMU-132's treatment of refractory/relapsed mTNBC that it was to unveil at the ASCO Meeting and the Best of ASCO Program, when it did not; (2) in reality, the abstract for IMMU-132 that Immunomedics submitted to ASCO for presentation at the ASCO Meeting contained substantially the same data, information, content, and/or conclusions that the Company previously presented at the PEGS conference in Boston, disclosed in conference calls and on the Company's own website, in violation of ASCO's embargo; (3) as such, the Company faced a substantial risk that it would

likely be excluded from presenting at the ASCO conferences; and (4) the Company failed to maintain effective internal controls. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

252.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

253.   Moreover, while the Company's stock was artificially inflated, two of the Individual Defendants engaged in lucrative insider sales.

254.   The Individual Defendants additionally breached their fiduciary duties by recklessly mismanaging the Company and preventing it from participating in the ASCO Meeting and the Best of ASCO Program.

255.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Immunomedics' securities, and disguising insider sales.

256.   The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Immunomedics' securities, and disguising insider sales.

257.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

258.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Immunomedics has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

259.     Plaintiff on behalf of Immunomedics has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

260.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

261.     By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Immunomedics.

262.     The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Immunomedics that was tied to the

performance or artificially inflated valuation of Immunomedics, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

263.    Plaintiff, as a shareholder and a representative of Immunomedics, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from insider sales and benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

264.    Plaintiff on behalf of Immunomedics has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

265.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

266.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Immunomedics, for which they are legally responsible.

267.    As a direct and proximate result of the Individual Defendants' abuse of control, Immunomedics has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Immunomedics has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

268.    Plaintiff on behalf of Immunomedics has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

269.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

270.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Immunomedics in a manner consistent with the operations of a publicly-held corporation.

271.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Immunomedics has sustained and will continue to sustain significant damages.

272.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

273.    Plaintiff, on behalf of Immunomedics, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

274.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

275.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendant have caused Immunomedics to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to investigate their misconduct, defend the Company in the Securities Class Action and the Company's former officers and directors in the venBio Action, initiate lawsuits against venBio seeking to prevent and/or invalidate their proxy solicitations and to entrench themselves, and to lose business from customers who no longer trust the Company and its products.

276.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

277.    Plaintiff on behalf of Immunomedics has no adequate remedy at law.

## SIXTH CLAIM

**Against Defendants Sullivan, Pfreundschuh, and Goldenberg for Contribution
Under Sections 10(b), 20(a), and 21D of the Exchange Act**

278.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

279.    Immunomedics, and Defendants Sullivan, Pfreundschuh, and Goldenberg are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Sullivan's, Pfreundschuh's, and Goldenberg's willful and/or reckless violations of their obligations as offices and/or directors of Immunomedics.

280.    Defendants Sullivan, Pfreundschuh, and Goldenberg, because of their positions of control and authority as CEO, CFO, and COO of Immunomedics, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Immunomedics, including the wrongful acts complained of herein and in the Securities Class Action.

281.    Accordingly, Defendants Sullivan, Pfreundschuh, and Goldenberg are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the

Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

282.    As such, Immunomedics is entitled to receive all appropriate contribution or indemnification from Defendants Sullivan, Pfreundschuh, and Goldenberg.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Immunomedics, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Immunomedcs;

(c)    Determining and awarding to Immunomedics the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Immunomedics to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Immunomedics and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

- 88 -

guidelines of the board; and

       2. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

       (e)    Awarding Immunomedics restitution from Individual Defendants, and each of them;

       (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 19, 2020               Respectfully submitted,

Of Counsel:               **FARNAN LLP**

**THE ROSEN LAW FIRM, P.A.**     /s/ Michael J. Farnan
Phillip Kim               Brian E. Farnan (Bar No. 4089)
275 Madison Avenue, 40th Floor     Michael J. Farnan (Bar No. 5165)
New York, NY 10016         919 N. Market St., 12th Floor
Telephone: (212) 686-1060      Wilmington, DE 19801
Facsimile: (212) 202-3827       Telephone: (302) 777-0300
Email: pkim@rosenlegal.com     Facsimile: (302) 777-0301
                          Email: bfarnan@farnanlaw.com
**THE BROWN LAW FIRM, P.C.**     Email: mfarnan@farnanlaw.com
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427      *Attorneys for Plaintiff*
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net